Herman TAYLOR, Individually and as Personal Representative of the Estate of Marc E. Taylor, Deceased, and Anne Mauvais, Individually and as Personal Representative of the Estate of Robert G. Dodson, Deceased, Plaintiffs,

v.

TELEDYNE TECHNOLOGIES, INC., et al., Defendants.

No. CIV.A.1:00–CV–1741–J.

United States District Court, N.D. Georgia, Atlanta Division.

Sept. 7, 2004.

Arthur Alan Wolk, Catherine B. Slavin, Philip J. Ford, Wolk & Genter, Philadelphia, PA, Jason T. Schneider, Office of Jason T. Schneider, Atlanta, GA, for Plaintiffs.

Christopher Baker Hall, Corliss Lawson, David G. Greene, J. David Hopkins, III, Thomas J. Strueber, Lord Bissell & Brook, Henry R. Chalmers, Robert Leonard Rothman, Arnall Golden & Gregory, Atlanta, GA, David E. Azar, John B. Quinn,

Kenneth R. Chiate, Mary S. Thomas, Timothy L. Algers, Quinn Emanuel Urquhart Oliver & Hedges, Los Angeles, CA, for Defendants.

Michael J. Athans, Lord Bissell & Brook, William Bradley Hill, Jr., Ashe Rafuse & Hill, Atlanta, GA, for Intervenors.

Gerald A. McGill, John Kevin Griffin, McGill Griffin, Pensacola, FL, Gerald Phillip Ruleman, Lauren G. Danielson, The Danielson Law Firm, Marietta, GA, Matthew K. Clarke, The Wolk Law Firm, Philadelphia, PA, for Movants.

### ORDER

CARNES, District Judge.

This case is presently before the Court on an Application by Teledyne Technologies Incorporated (hereinafter "Movant" or "Teledyne") For Order To Show Cause Why Arthur Alan Wolk (hereinafter "Respondent" or "Wolk") Should Not Be Held In Contempt [175]. On March 22, 2004[214], the Court denied Respondent's Motion to Dismiss [185] and set down a hearing date on the Contempt Petition, thereby implicitly granting Movant's Application for Order to Show Cause [175]. (See also April 20, 2004 Order [219] (setting out basis for March 22, 2004 decision).) Accordingly, it is more precise to say that this case is presently before the Court on the issue of whether Respondent is in contempt, as well as Movant's alternative request that the Court vacate its previously issued protective order. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, does not hold Respondent in contempt. The Court does, however, **GRANT, in part**, and **DENY, in part**, Movant's Alternative Request to Vacate the May 20, 2003 Protective Order [161].

Also pending in this case are the following motions: Motion for Limited Unsealing of Documents Relating to Arthur Alan Wolk [222]; Motion for Relief from Court's April 28, 2004 Order Pursuant to Federal Rule of Civil Procedure 60(b) [229]; Motion for Sanctions Pursuant to Federal Rule of Civil Procedure 11[232]; Emergency Motion to Compel Production of Documents [237]; AND Motion to Strike Teledyne's Witnesses and Evidence Listed in Its Pre–Hearing Memorandum [246–1] Which were Requested in Discovery but not Provided on Basis of Improper Privilege Assertions [260]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that all of the above motions should be **DENIED as moot**.

### BACKGROUND

#### I. PRE–CONTEMPT APPLICATION PROCEEDINGS IN THIS COURT

The present contempt application has been filed by the defendant in a diversity case assigned to this Court. This diversity action arose out of an airplane crash in Georgia on June 29, 1999, that killed the only two persons on board. Their estates, represented by Herman Taylor and Anne Mauvais, filed a wrongful death action against Teledyne, alleging that the cause of the crash was a malfunction in the airplane's right engine. Mr. Wolk, the respondent in this contempt application, was lead counsel for the plaintiffs.[1]

The discovery process between the parties was extremely contentious, and the parties called on the Court on multiple occasions to referee the disputes; in addition, at the parties' request, the Court reopened discovery and also extended dis-

---

**1.** Initially, Wolk represented only plaintiff Taylor, but eventually he also took over the representation of plaintiff Mauvais' case.

covery. Even after the Court's direct intervention, the parties filed numerous additional discovery motions,[2] which motions this Court resolved in a seventy-one (71) page Omnibus Discovery Order issued on September 30, 2002 (hereinafter, the "Omnibus Discovery Order") [133].

In this Omnibus Discovery Order, the Court determined that plaintiffs' counsel had intentionally disobeyed the orders and directives of the Court and the federal rules governing discovery, and the Court excluded certain expert testimony proffered by plaintiffs as a result of this violation. In support of these sanctions, the Court issued very critical comments about the conduct of plaintiffs' counsel, Arthur Wolk, the respondent in this contempt application.

After the issuance of the Omnibus Discovery Order, plaintiffs filed, on October 15, 2002, a timely motion for reconsideration [135], expressing disagreement with the Court's assessment of the discovery disputes. On the same date, Mr. Wolk filed his own motion for reconsideration as to the critical comments directed at him [136]. Although this motion reflected his disagreement, in large part,[3] with the Court's analysis of the discovery disputes and with the sanctions imposed, the focus of Wolk's motion was his strenuous contention that the Court had unfairly singled him out by name in the Omnibus Discov-

ery Order inasmuch as Wolk cast responsibility on an associate in his firm for the handling of discovery in the case and denied his own involvement in any discovery violations, should any violations have occurred.

The Court had reasonably understood Wolk to be the attorney responsible for any discovery violations because he had entered an appearance and was lead counsel in the case, because he was the named partner of the law firm handling the case, and, most significantly, because he was the only attorney for plaintiffs who spoke at the discovery conference that the Court had previously convened concerning the ongoing discovery disputes. During that conference, Wolk had indicated familiarity with the discovery disputes at issue. Nevertheless, given the intensity and seeming earnestness of Wolk's assertions that he was not responsible for or aware of any discovery violations, this Court, three business days after the filing of his motion for reconsideration, *sua sponte* sealed the Omnibus Discovery Order until such time in the future as the Court deemed it appropriate to revisit the matter. (October 20, 2002 Order [141].)

Thereafter, the remaining discovery concluded uneventfully, with no need for further intervention by the Court, after which the parties attempted to mediate the case. In furtherance of this effort, on April 16,

---

**2.** These motions were: (1) Defendants' Motion to Strike Plaintiffs' Expert Reports and to Preclude Certain Expert Testimony [93]; (2) Plaintiffs' Motion for Cessation of Discovery Abuses [94–1] and to Compel [94–2] and for Sanctions [94–3]; (3) Plaintiffs' Motion to Extend Page Limit [95]; (4) Plaintiffs' Motion to Compel [96]; (5) Defendants' Motion to Preclude Testimony [99–2]; (6) Defendants' Motion to File Excess Pages [99–1]; (7) Defendants' Motion to Compel Plaintiffs to Complete Forms and Authorizations [108]; (8) Defendants' Motion to Strike [117–1] and to Preclude Testimony by Plaintiffs' Expert Elizabeth Laposata [117–2]; (9) Plaintiffs' Motion

to Compel [120]; and (10) Defendants' Motion to Preclude Testimony Based upon Additional Testing [121].

**3.** Wolk has never articulated an explanation that this Court can understand as to why his firm's handling of the Laposata report and deposition did not constitute intentional disobedience of the Court's previous directives and the federal discovery rules. Indeed, it was this Laposata matter that had triggered the Court's greatest concern. At any rate, Wolk contends that he was not responsible for the handling of the Laposata discovery.

2003, Wolk's co-counsel, Richard Genter, sent a letter to the Court's clerk indicating that all counsel believed that settlement might be possible, but "an impediment to settlement [was] the Court's Order of September 30, 2002," as well as the motions filed thereafter; accordingly, Genter requested a conference with the Court.[4] (April 16, 2003 Letter to Court [154] at 1.) On May 2, 2003, the Court's deputy clerk faxed a letter, dated May 1, 2003[152], setting down a telephone conference for May 8, 2003.[5] On May 8, 2003, the Court convened this conference. (*See* Transcript, May 8, 2003 Telephone Conference, "Transcript" [156].) The conference focused on three primary matters: (1) the parties' request that the Court vacate the Omnibus Discovery Order to facilitate what appeared to be an imminent settlement; (2) factors that created some hesitancy by the Court to vacate the Order; and (3) the Court's inquiry as to how it could proceed on such a request, as the Court had learned since scheduling the conference that Wolk had filed a motion to recuse the Court.[6]

Counsel and the Court discussed all matters at length. As to the second mat-ter, the Court expressed concern that a settlement of the case for less than its value to plaintiffs not occur simply to allow Mr. Wolk to be rid of an order that was critical of him. As to this inquiry, plaintiffs' counsel assured the Court that plaintiffs were aware generally of what was about to transpire and were in agreement; further, counsel indicated that plaintiffs would be receiving a large settlement with which they were apparently well satisfied. (*Id.* at 13–17, 26.)

The Court also expressed its concern that if the discovery violation underlying the Laposata expert testimony, which appeared to have also occurred in a Texas case handled by plaintiffs' counsel, were to repeat itself a third time, a vacated order would not be available to serve as a record of the prior conduct.[7] Genter agreed, stating that "if the Order is vacated, it's my understanding that it's void *ab initio* and it could not and should not be used in any other litigation in any other context." (*Id.* at 17–18.) Wolk then interjected that the attorney responsible for this discovery matter had lost her job because of the Order.[8] The Court also indicated its un-

4. "Accordingly, in addition to facilitating settlement discussions, the parties desire to confer with the Court regarding the disposition of all pending motions and other matters which will facilitate the just, speedy, and inexpensive disposition on [sic] the entire action." (April 16, 2003 Letter to Court [154] at 2.)

5. At the request of the Court, Genter sent a second letter explaining the intended purpose of the meeting. (May 6, 2003 Letter to Court [155].) The reasons for the Court's request for a second letter were explained at the subsequent May 8, 2003 telephone conference. (*See* Transcript, May 8, 2003 Telephone Conference [156] at 3–6.)

6. Unbeknownst to the Court when its clerk sent a letter on May 2, 2003 scheduling a telephone conference, on that same day, Wolk had filed a raft of pleadings, including a Mo-tion to Recuse the Court and a Mandamus Petition with the Eleventh Circuit. (*See id.* at 3–9.)

7. The Laposata matter is discussed at length in the now-vacated Omnibus Discovery Order [133] at 37–53. See also *id.* at 26–33 for discussion of similar allegations with regard to another expert witness tendered by plaintiffs in the *Taylor* litigation.

8. The Court: My concern is with the Laposata business. I continue to be very concerned about what happened by plaintiff's counsel. . . . If you go to another court and we have this same incident happen now a third time where you all are told to do expert reports and don't really do them or give something that's you know, so flimsy as not to be a report at all, that is my concern. And I don't know. Perhaps this whole incident has been

certainty about how vacating the Order would impact the case procedurally if a settlement did not occur, because, in that event, the same discovery disputes that triggered the Omnibus Discovery Order would remain to be addressed again by the Court. (*Id.* at 12–13.) It was agreed that if a settlement did not occur, these matters would have to be readdressed by the Court, although plaintiffs' counsel emphasized the likelihood that a settlement would occur. (*Id.*) Finally, counsel for defendants had indicated their consent to the order requested by Wolk and Genter. (*Id.* at 11–12.)

After a discussion of the above matter, the Court indicated its general willingness to proceed in the manner requested by plaintiffs' counsel (*id.* at 32), but the Court also expressed its unwillingness to enter an order vacating the Omnibus Discovery Order while a motion to recuse was pending, as the Court believed a motion to recuse deprived it of the ability to enter a substantive order prior to resolving the recusal motion. (*Id.* at 6–7, 23–24, 27–28, 30–32.) Both Genter and Wolk appeared to indicate that they would withdraw the motion to recuse, after which the Court would vacate the Omnibus Discovery Order and would hold in abeyance any future ruling on these old discovery disputes for the purpose of allowing settlement discussions to continue. (*Id.*) It was agreed that after notifying the Court that the motion to recuse had been withdrawn, counsel would then submit a proposed order to vacate the Omnibus Discovery Order. (*Id.* at 30–32.)

Finally, the Court indicated that it had reviewed the discovery matters and was prepared to indicate to counsel the matters on which the Court might be inclined to reconsider. Although counsel indicated

---

impressive enough to everyone that it will not repeat itself.

. . . .

Wolk: Your honor, this is Arthur Wolk speaking.
The Court: Yes?
Wolk: First, Ma'am the attorney who handled the Fifth Circuit matter and who was involved in the day-to-day affairs of this matter has lost her job because of your Order. So, I think that to the extent the Court believes that there is a lesson to be learned, the person who was with me for 18 years no longer has a job here.

(Transcript [156] at 17–19.) Later in the conference, however, Wolk undercut this remark when he responded to the Court's direct inquiry whether he had fired this associate for some wrongdoing on her part:

Wolk: No, Ma'am. I terminated her because she didn't apprise me in sufficient time to show that you were ruling in a manner that should have suggested to me to file a motion for recusal a long time before it got filed. It was clear to me that we were getting home-towned.

(*Id.* 20–21.) Notwithstanding the above comment, it should be noted that Wolk was the only attorney for plaintiffs who had spoken at the earlier telephonic discovery conference, and his statements at that conference suggested an awareness of the Court's other discovery rulings. The Court made no other rulings after this conference and before issuance of the Omnibus Discovery Order that this associate could have disclosed to Wolk. Thus, whatever earlier ground for recusal Wolk may have believed to have existed, he would have necessarily been aware of that ground.

Finally, in the interest of completeness, the Court also notes that evidence developed during the contempt proceeding has created further confusion about Mr. Wolk's representations to the Court at the May 8, 2003 conference concerning this matter. Specifically, Mr. Wolk testified at the hearing that this associate left his firm in August 2002, which departure would have been prior to the Court having issued its Omnibus Discovery Order and therefore the latter could not have possibly influenced the employment status of the associate. (Transcript, June 4, 2004 Contempt Hearing [265] at 25 (Wolk: She left on August the 31st).) Nevertheless, at this juncture, the circumstances of the departure of this associate are not relevant to the questions before this Court.

that they did not require this information for their settlement negotiations, the Court disclosed its thinking to allow counsel, particularly plaintiffs' counsel, a general understanding of the Court's leanings in order that they could fairly negotiate a settlement. Accordingly, the Court indicated that, upon rehearing, the Court might be inclined, as to the "testing" matter, to order a lesser sanction than preclusion of this evidence. (*Id.* at 16–17.) As to Wolk's allegation that the Court had incorrectly identified him as the attorney responsible for discovery in the case—and therefore had incorrectly faulted him for any discovery violations—the Court indicated its conclusion that a hearing at which Wolk would be pointing fingers at a now-terminated associate would be an "unseemly" event; instead, to the extent that the Court identified discovery violations in a future order, it would simply identify the attorney as "plaintiffs' counsel," and mention no attorney by name. (*Id.* at 19–20.)

Given the representations of Genter and Wolk, the Court expected to hear from plaintiffs' counsel, following this conference, that they had withdrawn the motion to recuse, after which the Court would enter an order vacating the Omnibus Discovery Order. If the parties indeed settled, as they indicated they would likely do, the Omnibus Discovery Order would be permanently vacated; if the parties did not settle, the Court would then again issue an order resolving the discovery disputes that had been the subject of the earlier Order. The above was the Court's expectation. It was not what happened.

Instead, even though he had initiated the conference to request the Court to vacate the Order, Wolk reversed course the next day in a letter, dated May 9, 2003, faxed to the Court. (May 9, 2003 Letter to Court [155].) In essence, Wolk indicated his belief that withdrawal of the motion to recuse and mandamus petition might

imply his acknowledgment that he or his firm had committed discovery violations. He now indicated that he wanted an order vacating the Omnibus Discovery Order to be issued first, after which he would withdraw the pending motions, including the motion to recuse, as moot. (*Id.* at 3.) Wolk closed by asking the Court to convene another telephone conference immediately "to make [the Court's] position known...." (*Id.*)

The Court did not convene a conference immediately, as requested by Wolk, but instead, on May 12, 2003, caused a letter to be sent to counsel indicating that the Court intended to issue an order responsive to the letter on May 13, 2003. On May 13, 2003, the Court issued a lengthy order setting out the events that had occurred. At bottom, the Court indicated that it did not believe it proper to grant a motion to vacate a previous order while a motion to recuse was pending and further that the Court would not negotiate with counsel regarding this matter. (May 13, 2003 Order [157] at 15.) The Order concluded by directing plaintiffs' counsel to indicate by May 16, 2003 whether counsel wished to proceed as they, themselves, had suggested during the May 8th conference or whether they instead wished to litigate the motion to recuse and motions for reconsideration. If the latter, the Court indicated that it would issue a scheduling order setting down a briefing schedule for the motion to recuse and a hearing schedule thereafter for the motion to reconsider. (*Id.* at 22–23.)

The next day, May 14, 2003, Wolk faxed a letter to the Court's court reporter implying that the Court might alter the record of the proceedings and requesting that the reporter preserve "any media" used to record any proceedings before the Court and also requesting that no such media be "altered, destroyed or in any manner changed or discarded without an order

from at least the Court of Appeals for the Eleventh Circuit." (May 14, 2003 Letter to Court Reporter [165].) Wolk also indicated that he would want "the opportunity for a court reporter of [his] choice to examine the original for purposes of determining the accuracy of the transcription," as the "imbalance of power is frightening." (*Id.*)

On that same date, Wolk also faxed another letter to the Court. (May 14, 2003 Letter to Court [166].) It is difficult to adequately capture the substance and tone of this letter with a paraphrase. The letter begins with Wolk indicating that he would like to proceed with the motion to recuse and would like that motion to be transferred out of the Northern District of Georgia to the Eleventh Circuit. (*Id.* at 1.) Thereafter, Wolk indicates that he is "not unmindful of the Court's considerable political power in Georgia and the King and Spalding connection" and opines that he will need to go to Washington to get justice. (*Id.*) The letter is very scattered and touches on a variety of topics on the mind of Wolk, including his explanation of the reason a federal district court in Texas had ruled against him in a similar discovery dispute in other litigation, cited by the Court in the Omnibus Discovery Order:

> So rather than the Fifth Circuit case, that held the trial judge to have abused his discretion, being another example of the way we do business, it is none of that. It stands for a very simple proposition in my opinion—two Jewish families from New York who lost their lives need not sue a Southern Baptist in the Federal Court in Texas, regardless of his causal negligence, where there has

already been a large settlement and the defense lawyer is a bud of the Judge. (*Id.* at 4.) [9] Wolk concluded this six-page letter by suggesting that "Let's both take a deep breath and fix this." (*Id.* at 6.) The "fix" that he envisioned was for the Court to immediately sign an order vacating the Omnibus Discovery Order. (*Id.*)

The Court did not respond to Wolk's May 14th letter. Apparently because the Court did not get back to him immediately, Wolk attempted to prod the former by faxing another letter on May 16th, which attached a revised order vacating the Omnibus Discovery Order for the Court's signature.[10] (May 16, 2003 Letter to Court [167].) Wolk concluded his letter with the following paragraph:

> Your Honor, I am anxiously awaiting your response so that I can try to get this matter concluded. I would really like to keep up the momentum toward settlement, if that is possible. Can I please hear from you?

(*Id.*)

Wolk did not hear from the Court. The next communication from him was a letter dated May 19, 2003, in which he reflected his apparent change of mind as to his requests to litigate the motion to recuse, and thereafter the motions to reconsider. (May 19, 2003 Letter to Court [168].) In that letter, Wolk indicated that he was enclosing a copy of a Notice of Withdrawal of Plaintiffs' Motion to Recuse Without Prejudice. He further indicated that he looked forward to receiving a signed copy of the parties' agreed order (vacating the Omnibus Discovery Order and directing that it not be disclosed or publicized), after which he would be able to report a settle-

---

**9.** It is apparently Wolk's position that discovery matters in the Texas case had likewise been handled by the same associate who handled discovery in this case, again not by Wolk. (Transcript [156] at 19; Mot. for Recons. [136] at 3, 17.)

**10.** This proposed order was similar to an earlier proposed order submitted by plaintiffs' counsel [155], and also added language proposing that all related proceedings and orders should also be sealed, only to be unsealed by order of this Court.

ment of the case. Respondent concluded this letter by stating "I trust this is received by you as evidence of my bona fides towards a peaceful resolution." (*Id.*)

On May 20, 2003, the Court convened another telephone conference in the case. (Transcript, May 20, 2003 Telephone Conference [160].) The Court explained a couple of changes that had been made in the parties' proposed Order, which are not directly pertinent to the present Contempt Application, and counsel agreed to these changes. (*Id.* at 3–5.) The Court then indicated that it would sign the proposed order, as revised, that afternoon. (*Id.* at 6.) The Court further instructed the parties to indicate in a joint letter whether the case had settled, and, if the case had not settled, the litigation would proceed as previously outlined. (*Id.* at 8.) Finally, the Court directed that, other than the above joint letter, no further letters be sent to the Court. (*Id.* at 8–9.)

The Court entered the above Order vacating the Omnibus Discovery Order (Order [161].) The Order reads as follows:

The Court does hereby revoke and vacate its Order of September 30, 2002.

The Order of September 30, 2002, shall be marked not for publication *nunc pro tunc,* sealed, and *shall not be disclosed without further order of this Court.*

All proceedings, including transcripts of telephone conversations, court orders, and correspondence in connection with the Order of September 30, 2002, or relating thereto, are sealed, at the request of counsel, and shall not be disclosed without further order of this Court.

The parties, *their representatives,* successors, insurers, and *all others are directed not to publicize the Order of September 30, 2002, to destroy all copies,* and to obtain the return or destruction of all copies of the said Order.

Should the Order of September 30, 2002, in violation of this Order, be provided to any other court, a copy of this Order shall be sufficient to indicate to that court that it be disregarded in its entirety.

(May 20, 2003 Order [161], "May 20th Order" or "Protective Order," (emphasis added).)

In short, the above Order, which was submitted by plaintiffs' counsel, directed that no one should "publicize" the now-vacated Omnibus Discovery Order nor should the latter Order be "disclosed" without prior approval of this Court. Further, all counsel and involved parties agreed to destroy any copy of this Order that they might possess. Finally, the Order directed that the proceedings and pleadings in connection with this Order would remain sealed, absent further order of this Court.

Thereafter, on the next day, May 21, 2003, Wolk faxed a letter indicating that the case had settled and expressing appreciation to the Court, on behalf of all concerned, for its help in resolving the case. (May 21, 2003 Letter to Court [163].)

## II. WOLK'S NEW LITIGATION IN PENNSYLVANIA

As noted above, Wolk had requested that this Court issue an order that not only vacated the Omnibus Discovery Order, but that also directed that this order not be publicized and that maintained the order under seal. The Court understood that Wolk wanted the Omnibus Discovery Order to remain sealed because of the critical comments directed at him and because of his desire that these comments not be aired publicly. As the Order had been vacated, the litigation was about to be settled, and the defendants agreed, the request appeared reasonable, and the Court accommodated Mr. Wolk in his request. In short, the Court concluded that

the litigation had achieved the finality that Mr. Genter had indicated was the goal when he and Wolk put into motion the proceedings that led to the Court's vacating of the Order. *See* discussion *supra* at 1327 n. 4, 1328 and *infra* at 1339–40, 1356–57.

Finality did not occur, however. Instead, even though he had sought the sealing of the vacated Omnibus Discovery Order because it had contained criticisms of his professional conduct, Wolk filed a defamation action based on this Order against Movant and Intervenors [11] in a state court of Pennsylvania, less than four months after this Court issued the Protective Order vacating and sealing the Omnibus Discovery Order. In that action, Wolk essentially repeated these same criticisms made by the Court in a purported paraphrase of the Order. This state defamation action was removed by the defendants to the Eastern District of Pennsylvania on or about October 14, 2003.[12] The Court learned of Wolk's Pennsylvania litigation when the Movant filed the pending Application for Contempt on November 18, 2002.

Movant has provided a copy of Wolk's defamation complaint, which is, in fact, a Fifth Amended Complaint [13] to a preexisting state action against different defendants based on events occurring prior to or independently of this action. The Complaint alleges conspiratorial conduct against Wolk, predating the *Taylor* action and involving defendants other than the defendants in the *Taylor* action, and indicates that it was decided in the "highest circles" of the aviation defense bar, along with insurance companies, that the best way to prevail against Wolk was to attack him in the media and in pretrial motions, in order "to hold the plaintiff up to false light, to destroy his credibility with the courts, to extort settlements in cases that should go to trial, to interfere with his relations with clients, to prevent his getting new clients, and to avoid, at all costs, a decision on the merits of cases the plaintiff brought." (Am. Compl., attach. as Ex. 3 to Application for Order to Show Cause Why Arthur Alan Wolk Should Not Be Held in Contempt [175], at ¶ 38, 40.) [14]

11. Since the filing of the Contempt Application, counsel for Teledyne in the *Taylor* case, who are also defendants in the Pennsylvania litigation, have been permitted to intervene [206].

12. (*See PACER, E.D. Pa. Civil Docket for Arthur Alan Wolk v. Joseph W. Williams, and Robert Johnson, and Ross Harvey, and Teledyne Industries, Inc., a.k.a. TDY Industries, and Teledyne Technologies, Inc., and Teledyne Continental Motors, Inc., and Bryan L. Lewis, and Allegheny Technologies, a.k.a. Allegheny Teledyne, and Thomas Hart, and Lord Bissel (sic) & Brook, and Thomas J. Strueber, and David G. Greene, and Kirtland & Packard, and Michael L. Kelly, and John D. Wilson, and David M. Jacobi, and Wilson Smith Cochran Dickerson, and Paul E. Moran, and Mendes & Mount, and Certain Under-writers at Lloyd's of London, and Robert M. Kern, and Kern & Wooley, and Brown & Sons, Ltd.*, No. 2:03–CV–05693–NS.)

13. The Fifth Amended Complaint was apparently filed in federal court, after removal. Defendants also attached a Fourth Amended Complaint to their Contempt Application [175], which Fourth Amended Complaint was apparently filed in the state court of Pennsylvania.

14. As to causes of action unrelated to the *Taylor* litigation, arising out of alleged conduct that predated the *Taylor* dispute, Wolk first cites to defamation on the Internet in which an attorney named Kelly allegedly criticized Wolk on an aviation website in 2000 in order to "incite Avweb readership into a defamation frenzy" against Wolk. (*Id.* at ¶ 44.) The Complaint further indicates that Avweb made false statements in 2001 concerning what Wolk had argued to a jury with regard to a Cessna crash. (*Id.* at ¶ 55.) The Complaint goes on to allege that, beginning in 1999, Kelly made false statements in a California court charging Wolk with obstructive

As to Movant in this case, Wolk accuses it, and the attorneys who represented Teledyne in this Court, of deliberately procuring an order from this Court that falsely faulted Wolk for discovery ·violations and then sending that order to fellow aviation defense attorneys. (*Id.* at ¶¶ 73, 79, 93–94, 99, 100, 101.) In his allegations, Wolk discusses at length the Omnibus Discovery Order sealed by this Court, paraphrasing the critical comments that the Court made. He also purports to characterize this Court's reasoning behind the vacating and sealing of the Order, indicating that the Court's actions in sealing and later vacating the Order suggested a recognition that the Court had made a "grievous error," evidenced by the fact that the Court ultimately withdrew the Order. (*Id.* at ¶ 81; *see also* ¶¶ 82, 86–87; *see generally* ¶¶ 69–99, 162, 175.[15])

Although the Complaint alleges that the Movant disseminated the Omnibus Discovery Order to other individuals not involved in the *Taylor* litigation (*see, e.g.,* ¶¶ 94–95), the Court does not read the Complaint to aver that Movant or Intervenors ever vio-

lated the Court's sealing order, issued in October 2002, or the Court's ultimate Protective Order, issued in May 2003, which sealed the vacated-Omnibus Discovery Order and directed that it not be publicized or disclosed. In addition, nothing that has occurred in this contempt proceeding has suggested that·Movant or Intervenors ever disseminated the Order once it was sealed, which occurred some two plus weeks after it was issued.[16] In short, the Pennsylvania complaint bases its claims of defamation against the Movant [17] (1) on pleadings filed *before* issuance of the Omnibus Discovery Order that alleged discovery violations by plaintiffs' counsel and (2) on Movant's mailing of this Omnibus Discovery Order to selected aviation defense counsel, *prior* to the Order being sealed or vacated.

## III. PRESENT CONTEMPT. APPLICATION

As a result of Wolk's discussion of the substance of the Omnibus Discovery Order in his defamation action, Movant filed a contempt application in this Court on November 18, 2003, asking the Court for an

conduct and tactics, when Wolk was, again, not the attorney handling the daily aspects of that case. (*Id.* at ¶ 64–65.)

15. Wolk avers:

86. What the district court had interpreted to be intentional noncompliance by the attorneys in Wolk's law firm was, in actuality, the result of the court not understanding and/or failing to examine the actual obstructive and evasive tactics the defense was engaged in, which forced the attorneys in the plaintiffs firm into situations where timely compliance with discovery orders was extremely difficult.

87. The Northern District of Georgia's own recognition of this is again reflected by the fact that it later completely withdrew the order.

(*Id.* at ¶¶ 86–87.)

16. Indeed, it is the Court's understanding that Respondent has identified only one instance in which the now vacated Omnibus Discovery

Order was ever filed or used in a court proceeding. Specifically, in *LaHaye v. Israel Aircraft Industries,* counsel for the defendant there filed a copy of this Order in connection with a discovery dispute with Mr. Wolk in that case at a time when the Order was sealed but not yet vacated. (*Id.* at ¶ 110.) According to Movant, the attorney, who is not involved in this action, promptly withdrew the pleading following notification by Wolk's office that it was under seal. (Reply Mem. in Supp. Of Application for Order to Show Why Arthur Alan Wolk Should Not Be Held in Contempt [183] at 12.) Wolk, however, believes that the presiding judge must have read the Order anyway because it remained on Pacer and because the judge was not receptive to Wolk's advocacy at trial. (Respondent's Legal Mem.,·attach. as Tab E to Consolidated Pre–Hearing Mem. [244] at E–16.)

17. Whenever the Court uses the term "Movant," it also intends to refer to the Intervenors, unless otherwise indicated.

order to show cause why Wolk should not be held in contempt [175]. Movant argued that Wolk's action was in violation of the Protective Order in the *Teledyne* action, directing that no party or representative publicize or disclose the Omnibus Discovery Order. Movant further noted that Wolk describes in the Complaint matters in documents and proceedings under seal. Finally, Movant alleged that, given a reading of the Amended Complaint, it is apparent that, contrary to the Protective Order, Wolk has maintained a copy of the Omnibus Discovery Order.

As a remedy for these alleged violations of the May 20th Order, Movant asked that this Court hold Respondent Wolk [18] in contempt and sought an order enjoining the case pending in the Eastern District of Pennsylvania or, in the alternative, an order vacating and unsealing prior orders [133, 141, 161] of this Court so that Movant could use the Omnibus Discovery Order in its defense of the Pennsylvania action.[19] Movant also sought attorney's fees.

Respondent filed a timely response to Movant's contempt application on December 3, 2003[178]. On December 22, 2003, Respondent also filed a motion to dismiss the contempt application [185]. On February 2, 2004, Respondent filed a motion for transfer of the contempt action to the Eastern District of Pennsylvania, and, in the alternative, a motion for recusal [199]. The Court denied both motions in a brief order issued on March 22, 2004[214], in which Order the Court indicated that it would indicate its reasoning for the rulings in an order to be released in the future.

In the meantime, the Court set the hearing date on the Contempt Application for June 3, 2004 and directed the parties to complete by May 14, 2004 whatever discovery was needed for the hearing or for the preservation of the testimony of witnesses beyond the Court's subpoena power. (March 22, 2004 Order [241] at 31.)

On April 28, 2004, the Court issued an order setting out the reasoning for its denial of Respondent's two pending motions. (April 28, 2004 Order [219].) With regard to Respondent's motion to dismiss, the Court's reasoning is discussed at length in the Court's Order of April 28, 2004 and touched on *infra*. With regard to the motion to transfer, Respondent had contended that the contempt application should be transferred from the Northern District of Georgia to the Eastern District of Pennsylvania because he could not receive a fair trial before any judge on this court. His basis for this contention was as follows:

21. Based on all of these facts, it is my (Wolk's) reasonable belief that *no justice can be obtained for a Jewish lawyer from Philadelphia anywhere in the Northern District of Georgia.*

22. Based on all the aforementioned facts and information known to the undersigned, it is my belief that *the "good ol' boy" network in Georgia would prevent any justice being obtained in this case because of the considerable political influence* it can, has been and will be exercised by Judge Julie Carnes, *including* political influence on the court *by 1)*

---

**18.** Wolk is referred to as "Wolk" or "Respondent" throughout the remainder of this Order.

**19.** Movant has now apparently reversed its preferred order of remedies and currently requests that the Court vacate the May 20, 2004 Protective Order, in toto, thereby reinstating and unsealing the Omnibus Discovery Order and other related sealed material. (Pre-

Hearing Mem., attach. to Consolidated Pre–Hearing Mem. of Teledyne Technologies, Inc. at 22[246].) Movant indicates that should the Court take this action, Movant would not seek that the Court enjoin Respondent from continuing with the Pennsylvania litigation. (*Id.* at 22 n. 6; Post–Hearing Br. of Teledyne Technologies, Inc. [267] at 15 n. 15)

her father; 2) her husband; 3) Lord Bissell & Brook; 4) *her politically obligated colleagues on the bench;* 5) the defendant's insurance carrier.

(Wolk Aff., attach. as Ex. D to Wolk's Venue and Recusal Mem., at ¶¶ 21, 22 (emphasis added).) Wolk also suggested that judges who had reviewed an earlier mandamus petition in the underlying litigation—i.e., Eleventh Circuit judges—may have formed a bias against him. (Wolk's Venue and Recusal Mem. at 10.) This Court found no basis for such allegations and denied Respondent's Motion to Transfer. (*See* April 28, 2004 Order [219] at 36–37.)

Respondent had moved for recusal of this Court only if this Court denied the motion to transfer the case out of the district. Turning to the former motion, Respondent cited several bases for his motion. First, he argued that the Court's critical comments in the Omnibus Discovery Order, which the Court had ultimately vacated in anticipation of settlement at the parties' request, necessitated recusal. He also argued that his initiation of "confidential proceedings" against this Court prior to entry of the Protective Order on May 20, 2003 required recusal. The Court denied Respondent's motion for recusal on these grounds. (*See* April 28, 2004 Order [219] at 42–55. *See also* Supplemental Order Concerning Respondent's Motion to Vacate Order of April 28, 2004 and For Recusal [223], which Order is issued this same date.)

Respondent then contended that the Court should recuse because the spouse of the Court is a partner at King and Spalding, which is "one of the most politically influential law firms in the State of Georgia, and perhaps in the country," because Respondent believed King and Spalding to regularly represent Movant's insurance carrier in the underlying litigation, and because an associate in the law firm that

actually represented Movant, Lord Bissell and Brook, had once worked as an associate at King and Spalding. (Wolk Aff., attach. as Ex. D to Wolk's Venue and Recusal Mem., at ¶¶ 16–18.) The Court found these grounds insufficient to warrant recusal. (April 28, 2004 Order [219] at 39–42.)

As with the motion to transfer, Respondent also contended that this Court should recuse because of his perception of anti-Semitism on the bench of the Northern District of Georgia (Wolk Aff., attach. as Ex. D to Wolk's Venue and Recusal Mem., at ¶ 21) ("it is my reasonable belief that no justice can be obtained for a Jewish lawyer from Philadelphia anywhere in the Northern District of Georgia") and because of some undefined political power that Respondent perceived this Court to have in that the Court is "from an extremely influential judicial family in the State of Georgia" (Wolk Aff., attach. as Ex. D to Wolk's Venue and Recusal Mem., at ¶ 20) and therefore again:

> Based on all the aforementioned facts and information known to the undersigned, it is [Respondent's] belief that the "good ol' boy" network in Georgia would prevent any justice being obtained in this case because of the considerable political influence it can, has been and will be exercised by Judge Julie Carnes, including political influence on the court by 1) her father; 2) her husband. . . ."

(*Id.* at ¶ 22 (emphasis added).) Again, the Court found these contentions to be insufficient to justify recusal. (April 28, 2004 Order [219] at 56–58).

Finally, in support of his recusal motion, Respondent chose to announce that he had been pursuing his own investigation of the Court, through the Freedom of Information Act, by requesting from the Federal Bureau of Investigation and United States

Senate Judiciary Committee files compiled during these groups' background investigations of the undersigned during the judicial nomination process. (*Id.* at 53, 55–56.) As this Court would not have known this information, absent Respondent's decision to disclose it, the Court inferred that Respondent was "at best...attempting to create a ground for recusal with this disclosure [and] at worst, he would appear to be trying to intimidate this Court." (*Id.* at 55.) Citing caselaw that disfavored rewarding such behavior by litigants, the Court also found this new disclosure to be an insufficient basis for recusal. (*Id.* at 55–56.)

On April 29, 2004, the day after release of the above Order, the Court issued an order directing the parties to file pre-hearing memoranda by May 21, 2004, in anticipation of the June 3, 2004 Hearing. (April 29, 2004 Order [220].) To insure a "focused and orderly" proceeding (*id.* at 1), the Court set out its preliminary analysis based on the pleadings already filed and requested briefing on particular matters. Specifically, the Court indicated its difficulty discerning a persuasive argument that Respondent's summary of the Court's vacated Order in a publicly-filed complaint had not publicized and disclosed the substance of that Order, both as a linguistic matter and because Respondent's co-counsel had given assurances to the Court and Movant that indicated that the vacating of the order would effectively end all other litigation. (*Id.* at 2.) Accordingly, the Court indicated that while it would continue to entertain arguments by Respondent on this point, the Court wished the parties to focus on the appropriate relief should the Court ultimately conclude that a violation had occurred. (*Id.* at 2–3.) To that end, the Court noted that, although Respondent had offered little legal analysis on this point, it shared Respondent's concerns as to the propriety of injunctive relief that effectively halted litigation in another court. (*Id.* at 3–4.) The Court sought more helpful briefing from both parties on this matter. (*Id.* at 4.)

The Court further indicated that even were some sort of injunctive relief authorized, the Court was uncertain that it would wish to exercise its discretion in this manner. (*Id.*) The Court noted that it would have been prudent for Respondent to have sought a modification of the Protective Order before disclosing and publicizing the vacated Omnibus Discovery Order, as he had arguably done in the Pennsylvania Complaint. (*Id.* at 4–5.) As Respondent unfortunately had not done so, the Court suggested that he might wish to purge himself of any potential contempt by requesting such a modification. (*Id.* at 5.) The Court indicated that it would review any such request under a good cause standard. The Court further envisioned that any evidence at the upcoming hearing pertinent to a need to modify the Protective Order would focus on (1) Respondent's apparent position that the non-disclosure provisions of the Protective Order had been purportedly intended for his benefit and his assertion that Movant had been aware that he intended to sue for defamation, notwithstanding the entry of the Protective Order and (2) Movant's apparent position that Movant had fairly relied on the terms of the Protective Order as effectively ending the litigation between the parties. (*Id.*)

The Court points out that it was the Court that explicitly suggested to Respondent an exit strategy—that would avoid a contempt citation—for the predicament in which he had gotten himself. The Court takes pains to emphasize this point because Respondent has continued to argue quite vehemently that this Court is biased against him and is determined to hold him in contempt. Indeed, shortly after the release of these Orders, on May 10, 2004,

Respondent filed a Motion to Vacate the Order of April 28, 2004 and for Recusal of Judge [223] and a Motion For Limited Unsealing of Documents [222]. In these pleadings, Respondent further escalated the rhetoric found in his earlier motion to transfer and motion to recuse. Much of the pleadings are just a rehash of Respondent's previous contentions, with more talk about "Yankees" and "home-towning," and a point-by-point recitation of his disagreement with the April 28, 2004 Order.[20]

In the Motion For Limited Unsealing of Documents, however, Respondent made new statements concerning the Court that cannot be viewed as anything other than a further attempt to bully and intimidate the Court. Specifically, Respondent informed the Court that he had drafted and circulated within Congress a legislative bill that he had named the "Carnes Bill", which bill would purportedly broaden the ability of Congress to impeach and discipline federal judges. (Mot. for Limited Unsealing [222] at ¶ 7; Decl. of Arthur Alan Wolk in Support of Mot. to Vacate, Mot. to Recuse, and Mot. for Limited Unsealing, "Decl.," [224] at ¶ 66.) In that same vein, Respondent announced that he was requesting an impeachment investigation of this Court. (Mot. For Limited Unsealing [222] at ¶ 11; Decl. [224] at ¶ 67.) Respondent further

chose to disclose that he was writing a book called "The Judge," "a true story about corruption and despotism in the federal judiciary" that will profile this Court. (Decl. [224] at ¶ 68.) Respondent additionally fleshed out his reasons for seeking review of the FBI's background investigation of the undersigned because his "thinking was that perhaps the FBI investigation is cursory and doesn't disclose things like quid pro quos demanded or given for judicial appointments. . . ." (*Id.* at ¶ 64.) Respondent also disclosed his intention to file a Federal Tort Claims Act suit against this Court in the future. (Mot. for Limited Unsealing [222] at ¶ 13.) Finally, Respondent indicated that he had retained an unnamed psychiatrist to analyze this Court: "I then thought that perhaps Judge Julie E. Carnes is not evil, corrupt or both, but sick deserving of my compassion. I contacted a psychiatrist in Atlanta for purposes of reviewing Judge Julie E. Carnes opinions to see of(sic) there is a pattern that shows some psychological pathology. That is on going." (Decl. [224] at ¶ 69; Mot. for Limited Unsealing [222] at ¶ 12.)

The Court did not respond to these motions, but does rule on them this date.[21] Two days after filing the above two motions, Respondent filed a motion for sum-

---

**20.** As set out in the Court's Supplemental Order issued this same date, the Court agrees with one of Respondent's points and has corrected a statement in the previous April 28, 2004 Order that Respondent contends has misstated the meaning of an allegation in his Pennsylvania Complaint. *See* Order Amending April 28, 2004 Order, issued this date.

**21.** Since the Court's March 22 Order, Respondent has filed eleven (11) motions: Motion For Order To Show Cause Why Teledyne Should Not Be Held In Contempt [218]; Motion for Limited Unsealing of Documents Relating to Arthur Alan Wolk [222]; Motion to Vacate April 28, 2004 Order and for Recusal [223]; Motion to Extend Time for Discovery [228]; Motion for Relief from Court's April

28, 2004 Order Pursuant to Federal Rule of Civil Procedure 60(b) [229]; Motion for Sanctions Pursuant to Federal Rule of Civil Procedure 11[232]; Motion for Summary Judgment [233]; Emergency Motion to Compel Production of Documents [237]; Emergency Motion for Leave to Continue to Act Pro Se [259]; *Motion to Strike Teledyne's Witnesses and Evidence Listed in Its Pre–Hearing Memorandum* [246–1] Which were Requested in Discovery but not Provided on Basis of Improper Privilege Assertions [260]; AND Motion Pursuant to Federal Rule of Civil Procedure 60[270]. The last motion was filed in direct and acknowledged contravention of the Court's directive that Respondent file no more motions.

mary judgment [233], which motion is worthy of mention because, unlike many of the other pleadings filed by Respondent, this motion was lawyerly, analytic, and contained a discussion of the issues that was actually helpful to the Court in grappling with the anomalous facts and legal questions involved in this contempt application. Indeed, the Court has incorporated some of the reasoning in this motion in its final disposition of this matter.

The Court denied without prejudice this motion for summary judgment (May 17, 2004 Order [239] ), but directed Respondent to incorporate these arguments into his pre-hearing memorandum and directed Movant to respond to this motion in its own memorandum, as the Court "wishes to review all these matters in one consolidated pleading by each party." (*Id.* at 2.) The Court did, however, use some of the reasoning in Respondent's summary judgment motion as a springboard to explain, in great detail, the Court's preliminary analysis, as well as those legal and factual matters for which the Court did not yet have an answer. (*Id.* at 6–13.) The Court requested that the evidence introduced, as well as the pre-hearing memoranda, help the Court fill in these factual and legal gaps. (*Id.*) Again, it must be noted that the Court set out, at length, a roadmap of the evidence and analysis that would be pertinent to the Court in determining whether to modify the Protective Order and indicated that "[f]rom the partial facts presently known to the Court, it may be that Respondent can make such a showing." (*Id.* at 10.) This guidance to Respondent and the Court's indication of its

receptivity to a persuasive motion to modify hardly meshes with Respondent's continuing characterizations of this Court as being determined to hold him in contempt.

In addition, the Court largely removed, as a matter to be addressed by a contempt citation, the allegation that Respondent had retained a copy of the vacated Omnibus Discovery Order. The Court noted that as it was proceeding in a civil contempt application, any remedies that it provided would be prospective. (*Id.* at 6.) Whether or not Respondent had retained a copy of the Order in the past, which he apparently denied, he was apparently also going to testify that he did not presently possess such a copy. (*Id.*) Moreover, the Court, by separate order, had indicated that it would provide Respondent and Movant with a copy of this Order. Accordingly, the allegation that Respondent had improperly retained a copy of this Order no longer appeared to warrant consideration as part of a civil contempt citation, although the Court gave the Movant an opportunity to persuade the Court to the contrary. (*Id.*)

Finally, the Court issued two further directives that have become at issue. First, the Court directed that since "Respondent is the subject of the contempt proceeding, he should be represented by counsel at [the pre-hearing telephone conference] and at any hearing or other proceeding that is held." (*Id.* at 13.) Indeed, local counsel had appeared with Respondent throughout the entire litigation and a lawyer in his firm had entered an appearance in March 2004. *See* discussion *infra* at 1369–74.[22] Notwithstanding this di-

---

**22.** As discussed *infra*, Respondent has repeatedly challenged this requirement and argued that he was not given adequate notice because when this Court said "he [Respondent] should be represented by counsel at [an upcoming] conference and at any other proceeding that is held," (May 17, 2004 Order [239] at 13), he interpreted the word "should"

as meaning that the Court was simply offering Wolk advice and that it was up to him to decide whether to have counsel present. (Respondent's Br. in Supp. of Dismissal [208] at 2 ("Should" meant "ought to" rather than "required to").) He, therefore, claimed surprise that the Court required him to be represented counsel.

rective, in an exhibit buried within the voluminous materials filed by Respondent as part of his Pre–Hearing Memorandum on May 24, Respondent filed a declaration of his local counsel indicating that the latter probably would not be attending the upcoming hearing because of vacation plans. (Decl. of Jason T. Schneider, attach. as Ex. 213 to Respondent Arthur Alan Wolk's Consolidated Pre–Hearing Memorandum [244], at ¶ 7.) Moreover, even in this buried document, local counsel did not even request this Court's permission for this leave of absence; instead, he simply announced that he would probably not be present. As a result, the Court had to expend more of its time to issue an Order directing local counsel to be present. (*See* June 1, 2004 Order [254] at 2.)

Second, in this May 17 Order, the Court noted the drain on its resources that Respondent's repetitive and piecemeal filings had caused. The Court indicated that it wished to consider all arguments in one consolidated pleading, whose contents the Court described in great detail and, to that end, the Court directed that "there be *no further filings* of any dispositive-type motions excepts as incorporated in this pre-hearing memorandum nor any filing of any duplicative motion . . . ." (May 17, 2004 Order [239] at 2–3 (emphasis in original).)

The parties timely filed their pre-hearing memoranda. (*See* Docket Numbers 244, 245, 246.)

## IV. THE CONTEMPT HEARING AND POST–HEARING FILINGS

As scheduled, the Court held a hearing on June 3, 2004, which continued to June 4, 2004. Respondent testified throughout the first day. The only other live witness was Jonathan Friedman, a former associate at Lord Bissell & Brook, who was called by Movant and who negotiated the language of the release documents with

Richard Genter following the settlement of the case. The parties also played video portions of depositions, and submitted page designations of testimony from these depositions.

The parties timely filed their post-hearing memoranda. (*See* Docket Numbers 267, 268, 269.) They also later filed their joint exhibit list [264]. On July 16, 2004, notwithstanding the Court's directive that there be no more motions, Respondent nevertheless filed a motion pursuant to Federal Rule of Civil Procedure 60, in which motion he acknowledged his awareness that he was not in compliance with the Court's directive. (*See* Motion [270].) The Court struck this motion, admonished Wolk, and instructed Movant not to respond. (July 19, 2004 Order [271].)

## DISCUSSION

## I. DID RESPONDENT PUBLICIZE OR DISCLOSE THIS COURT'S OMNIBUS DISCOVERY ORDER?

### A. The May 20th Order

██ As noted, on May 20, 2003, this Court issued the Protective Order at issue in this contempt proceeding. This Order had been drafted by Respondent and it was largely though his entreaties that the Order was signed by the Court. Respondent and Movant indicated that entry of this order would facilitate the imminent settlement of the case. In this Order, the Court revoked and vacated the Omnibus Discovery Order and ordered that it remain sealed. (May 20, 2003 Order [161], *supra* at 1331.) As provided for in the proposed order, the Court also sealed all proceedings relating to the Omnibus Discovery Order. (*Id.*) This Protective Order further provided that the Omnibus Discovery Order "*shall not be disclosed without further order of this Court*" and barred the parties, "*their representatives*" "*and all*

*others*" from publicizing the Omnibus Discovery Order, as well as from retaining copies of that Order. (*Id.* (emphasis added).)

In his efforts to gain the Court's approval of the Order, Respondent, though his co-counsel, made certain statements to the Court, which statements provide the context in which Respondent advocated that the Court sign this Order. Specifically, in response to the Court's inquiry about future use of the Omnibus Discovery Order, were it vacated, Genter responded: "[I]f the Order is vacated, it's my understanding that it's void *ab initio* and it could not and should not be used in any other litigation in any other context." (Transcript [156] at 18.) In further advocating the Court to adopt Respondent's proposed order, Mr. Genter informed the Court that:

> [T]he Defendant, through Ms. Holahan (the insurer), has not yet made their best final offer because it's my understanding through discussions that there is some monetary value towards *closure of the entire litigation and all the ancillary motions and possible ancillary litigation.*

(*Id.* at 11 (emphasis added).) Respondent, Mr. Wolk, was on the telephone line with Genter and never disputed the above remarks.

As noted, in his Pennsylvania Complaint, Respondent mentioned and paraphrased the above Omnibus Discovery Order in some detail, indicating that this Court had issued critical comments directed at Respondent consistent with the described statements in the Complaint. Moreover, this Order, which Respondent had expended so much energy getting sealed, purportedly to avoid future embarrassment, was now the centerpiece of the defamation litigation filed by Respondent against the Movant. The first question before the Court is whether the prohibitions against publicizing and disclosure contained in the Protective Order applied to both Movant (and Intervenors) and Respondent, or whether these prohibitions did not apply to Respondent, as he has argued at various points in this litigation. If these prohibitions did apply to both parties, then the second question becomes whether the summary of the essence of the Court's Omnibus Discovery Order, through a detailed paraphrasing of its critical comments in a publicly filed legal complaint, constitutes a disclosure or publicizing of the vacated Omnibus Discovery Order. Moreover, to avoid any need to come back to this Court for continuing interpretations of the Order, should the Pennsylvania litigation proceed forward, the Court must also consider whether that litigation, proceeding in its predictable course, would likely trigger disclosure or publication of the Order by either party.

The Court has previously indicated its preliminary conclusion that the answer to the above questions is an affirmative one. (*See* April 29, 2004 Order [220] at 2–3; April 28, 2004 Order [219] at 28–31; May 17, 2004 Order [239] at 7–9.) As the Court has noted, clearly, the Protective Order applied to Respondent, as well as to the Movant. By its terms, the May 20th Order applies directly to the parties *and* their representatives, as well as to "all others." No language of the May 20th Order exempts Respondent from the terms of the Order, either generally or for a specific purpose. Presumably, Respondent knew this fact, as it was he who drafted and presented the order to the Court. (Respondent's Legal Mem., attach. as Tab E to Consolidated Pre–Hearing Mem., "Respondent's Legal Mem.," [244] at E–1, E–14.)

Also problematic for the Court has been Respondent's contention that the summarizing and paraphrasing of the Order in publicly-filed litigation did not constitute a

publicizing and disclosure of the Order, as Respondent disclosed to the world the substance of the Omnibus Discovery Order. Moreover, Respondent's position is particularly difficult to accept because he has taken the position that, had Movant summarized the vacated order in litigation, as Respondent did, Respondent would consider Movant to be in violation of the Protective Order and would sue Movant. (May 17, 2004 Order [239] at 8; Wolk Dep. at 82–83.) Yet, if a particular act, when taken by Movant, would constitute a "disclosure" or "publicizing" in violation of the Protective Order, the Court knows of no rule of construction that would call for a different interpretation of these words when it is Respondent who is committing the act. Words do not change their meaning depending on who the speaker or actor is.

Nevertheless, throughout this contempt litigation, Respondent has raised a variety of defenses to any contention that he has violated the terms of the Protective Order. The Court will address these arguments made by Respondent.

## B. Validity of Defenses Raised by Respondent

### 1. Respondent cannot control the interpretation of the Protective Order, merely because he drafted it for his own protection

Respondent has sometimes argued that he drafted the May 20th Order to provide him with protections against disclosure by others of the Omnibus Discovery Order, but that he intended to confer no restrictions on his own ability to disclose this Order, through a suit against Movant. (Respondent's Legal Mem. at E–14–15; June 3, 2004 Hearing Tr., "Hrg. Tr.," [265] at 31, 45–46, 61–62, 111.) His apparent

position, at times, has been that, because he drafted the Order and because its terms were intended for his benefit, this authorship has conferred on him the right to interpret the terms of the Order as he sees fit. Specifically, during his deposition, the following exchange occurred:

> Chiate: I take it, then, you believe the Order meant what it said?
>
> Wolk: No. *I believed the Order meant what I said.*

(Wolk Dep. 56–57 (emphasis added).) Movant played this part of the deposition at the hearing, and Respondent' tone was emphatic, leaving no room for doubt as to his meaning. In a further exchange:

> Chiate: You're interpreting the third paragraph words "shall not be disclosed" to be limited to preventing the filing of the actual document as opposed to disclosing the content of it; is that right?
>
> Wolk: No. . . . I wrote this.
>
> Chiate: Yeah. You've said that several times.
>
> Wolk: No. No. But, see, here's what you don't understand. You're not asking me what I meant. You're asking me what you think it means. I'm telling you what I meant, what I wrote. . . .

(*Id.* at 126. *See also, e.g.,* Wolk Dep. at 52 ("I know exactly what the judge ordered because I drafted this document"); at 63–64 (the same); Hrg. Tr. at 131 (Order was for his protection); at 45 (the same).)

Although Respondent now appears to have backed off this assertion somewhat,[23] should he resurrect this argument in the future, the Court notes its conclusion that such an argument is without merit. A court's order does not mean what a litigant, even a drafting litigant, subjectively and privately hopes it to mean; rather, the interpretation of a court's order triggers

---

**23.** In his hearing testimony, Respondent acknowledges that the Protective Order did not

create different standards for him and for Movant. (*See, e.g.,* Hrg. Tr. [265] at 138–39.)

an objective examination. Moreover, the Court is aware of no authority that would suggest that the drafter of an order is not held to the terms of the order just as is any other party subject to that order.[24]

Respondent's own testimony in this litigation has been inconsistent with an argument that he did not believe himself to be held to the terms of the Protective Order. Specifically, Respondent has indicated that he destroyed his copy of the Omnibus Discovery Order, as the Protective Order required. (Respondent's Br. in Supp. of Dismissal [268] at 4; Hrg. Tr. [265] at 42–44.) This conduct by Respondent suggests a recognition that the provisions of the Protective Order apply to him. Indeed, there is no language in the Protective Order indicating that Respondent is bound by some, but not all, of the Order's provisions.

In addition, Respondent has also testified that he always intended to apply to have the Pennsylvania Complaint placed under seal—which sealing Respondent contends would prevent the disclosure or publicizing of its contents—but he simply had not had the time to do so in the seven month period of time between his filing of the Complaint, on September 12, 2003, and the filing of his motion to seal, on April 13, 2004. (*See, e.g.,* Hrg. Tr. [265] at 149 (Wolk could not find the time to file a motion to seal because he had a lot of other motions to respond to and other clients to attend to) and at 47 (similar testimony).)

While it is difficult to accept Respondent's assertion that he lacked the necessary time to have the complaint sealed,

particularly given his demonstrated ability to file numerous pleadings in a short period of time, his acknowledgment that he had always intended to seal the Complaint suggests a recognition that the terms of the Protective Order—and, in particular, the non-disclosure terms—applied to him.

Finally, Respondent's hearing testimony concerning the painstaking process that he purportedly underwent in drafting a complaint that would not run afoul of the provisions prohibiting disclosure and publicizing of the Omnibus Discovery Order ends any further argument by him that he did not believe himself to be subject to the confidentiality provisions of the Protective Order. (*See, e.g., id.* at 158 (Wolk felt "really in a jam" trying to write a complaint that would not run afoul of the Protective Order); at 161 (he, Wolk, had "a difficult line to walk" in trying to draft a complaint that was compliant with the Protective Order); at 163–64 (Wolk found himself between "a rock and a hard place" and was walking "a fine line" in this endeavor).) *See also* discussion *infra* at 1354–56.

Indeed, Respondent acknowledged at the hearing that he had actually drafted the Pennsylvania Complaint prior to drafting the Protective Order to insure that he could mesh the provisions of the two documents in a way that would arguably allow him to base a lawsuit on the very vacated Order that he had urged never be disclosed or publicized again. (Hrg. Tr. [265] at 111; Wolk Dep. at 223.) In fact, Respondent indicated that he worked with a dictionary to accomplish what he admitted

---

**24.** To the contrary, the traditional rule of construction in interpreting contractual language construes ambiguities against the drafter. *See Glover v. Johnson,* 934 F.2d 703, 708 (6th Cir.1991) ("final order was a negotiated settlement between the parties. Defendants did not object to the language until now and have never asked the district court to clarify the purportedly ambiguous language."); *Cobell v. Babbitt,* 37 F.Supp.2d 6, 10 (D.D.C. 1999) ("Courts have been particularly unsympathetic to purported excuses for less-than-substantial compliance where the contemnor has participated in drafting the order against which compliance is measured.") (internal quotation and citation omitted).

to be this difficult feat. (Hrg. Tr. [265] at 111–12, 133.) Accordingly, Respondent has always been aware that he was subject to the provisions of the Order because he so drafted the Order. Moreover, the terms of the Protective Order make clear that Respondent, like Movant, is subject to all provisions of the Order.

In short, this Court concludes that, just like Movant, Respondent was not permitted to publicize or disclose the Omnibus Discovery Order under the terms of the Protective Order. The next question then is whether Respondent contravened that provision of the Protective Order through the filing of his Pennsylvania Complaint.

### 2. Respondent's detailed summary and paraphrase of the Court's findings in his Pennsylvania Complaint constitutes a disclosure and publicizing of this Court's Omnibus Discovery Order

Respondent has contended that he did not disclose the Omnibus Discovery Order in his Pennsylvania Complaint (1) because the Complaint did not attach a copy of the Omnibus Discovery Order or otherwise contain a verbatim disclosure of its terms and (2) because the defendants named in the Pennsylvania complaint already knew the contents of the disclosure order and because one "can't make known something to somebody who already knows about it." (Hrg. Tr. [265] at 111; *see also id.* at 133.) As to the second contention, as was made clear at the hearing, multiple persons besides the Movant and Intervenors necessarily became aware of Respondent's complaint when he filed it. Specifically, Respondent named persons other than Movant and Intervenors in his Complaint. Further, the Pennsylvania state and fed-

eral courts and their staffs, as well as their Clerk's Offices, became privy to the filed documents. Thus, this explanation by Respondent is not persuasive.

With regard to Respondent's contention that he did not disclose the Omnibus Discovery Order because he did not attach a copy of it to the Complaint nor directly quote it,[25] the Court concludes that disclosure can occur without such actions, and did occur here. In his Pennsylvania Complaint, Respondent set out, in ten paragraphs, a detailed paraphrase of the allegations of discovery abuse made by Movant in its pleadings before this Court in the *Taylor* litigation. (Am. Compl., attach. as Ex. 3 to Application for Order to Show Cause Why Arthur Alan Wolk Should Not Be Held in Contempt [175] at ¶ 74.) Respondent has argued that, as this recitation related to allegations made by Movant, it did not constitute a disclosure of the Court's Order. Had Respondent stopped with this paragraph, he would be correct. Instead, however, Respondent went on to indicate that this Court had "completely adopted" the above "false allegations" by Movant and issued an order containing numerous "scathing comments" regarding Respondent. (*Id.* at ¶ 79.) Moreover, Paragraph 84 summarized the characterizations of Respondent's conduct that the Court derived based on the above statements that the Court had adopted. (*Id.* at ¶ 84; *see also id.* at ¶¶ 98, 162, 175.) The Court concludes that, in these paragraphs, Respondent disclosed the findings of discovery violations and the criticisms that the Court directed at Respondent.

Moreover, given his ultimate acknowledgment that he was subject to the provisions of the Protective Order, just as was

---

**25.** Respondent tried not to use the exact language of *Omnibus Discovery Order* in his Complaint. (Hrg. Tr. [265] at 51.)

Movant, Respondent has made admissions that effectively concede that the public filing of this Complaint constituted a disclosure of the Omnibus Discovery Order. Specifically, in his deposition, counsel for Movant inquired whether Respondent would consider Movant to be in violation of the Protective Order had it summarized the Omnibus Discovery Order to the same extent that Respondent had in his Complaint:

> Chiate: Do you believe it (the Pennsylvania Complaint) violated the intent or spirit of the May 20 Order of Judge Carnes?
>
> Wolk: Of course not.
>
> Chiate: Then would it be your opinion, sir that Teledyne could file in any court that it chose an Affidavit setting forth what Judge Carnes ordered in her September 30 Order as long as they simply summarized or paraphrased it as you have . . .
>
> Wolk: No.
>
> Chiate: . . . without violating Judge Carnes' Order?
>
> Wolk: No. I'd think they'd be in viola-

tion of her Order and I can tell you they'd get sued.

(Wolk Dep. at 82–83.) [26]

At the hearing, Respondent acknowledged that a summary of the critical comments in the Omnibus Discovery Order risked injury to his reputation just as did a verbatim recitation, although the risk might be less with the former; this was why he wanted to seal the Pennsylvania Complaint. (Hrg. Tr. [265] at 129; *accord id.* at 131.) He further reiterated that had Movant summarized the Order in any fashion, Movant would have been in violation of the Order:

> I mean my view of it is that since the Order was in place for my protection, Teledyne's use of the Order or summary of the Order in any manner would have been, in my opinion, a violation of that Order.

(*Id.* at 132. *See also id.* at 139.)

In short, if Movant would be in violation of the Protective Order, had Movant filed a pleading that summarized the Omnibus Discovery Order to the same extent that Respondent summarized this document in his own Pennsylvania Complaint, then as a logical matter, Respondent has likewise violated the Order through the allegations in his Complaint.[27]

**26.** On further questioning about this matter, Respondent indicated that he cannot answer yes or no, and he launched into a rambling explanation that is difficult to decipher. (*Id.* at 83–89.) A fair reading of the deposition also suggests that, at that time, Respondent appeared to be of the view that he was not subject to the terms of the Protective Order to the same extent as was Movant. As noted *supra*, by the time of the contempt hearing, Respondent's position had evolved to the point where he acknowledged that he was also subject to the provisions of the Protective Order. It should be noted that following his deposition and prior to the hearing, the Court had issued an Order setting out its preliminary legal analysis and indicating its belief that Respondent was subject to the provisions of the Protective Order by the plain language of that document. *Supra* at 1335–37.

**27.** Under the same reasoning, the Court concludes that the filing of this public litigation served to "publicize" the Omnibus Discovery Order, in contravention of the Protective Order. Respondent has argued that when he drafted the word "publicize," he intended the word to mean going to the media with the Order, not to mean publicly filing the material in a state or federal court. (Hrg. Tr. [265] at 112 (Wolk testified that publicize means "advertise, issue a press release, send it to the press, make it available generally so that people would know about it.").)

Respondent claims he did not publicize the Order, as he did none of these:

Q. All right. And it would be wrong, it would be wrong, it would also be a violation of the order for you, Arthur Wolk, to publish a summary of the contents of that order as well, correct?

A. Unless I did it in the context that I did it, which was, number one, not disclose the

Moreover, Respondent's continuing argument that Movant should have been on notice that Respondent might sue Movant, even with the existence of the non-disclosure provisions of the Protective Order, is an argument that has no place in a determination of whether Respondent violated the Protective Order. This Order was an order of a court, and it should have been treated by Respondent with the appropriate respect. Respondent implored this Court to use its good offices to issue this Order. At that point, the drafted proposal became a Court Order, and whatever noises Respondent may or may not have been making outside the courtroom about his intention to sue anyway, did not give him the right to unilaterally disregard provisions of this Order that he later found inconvenient. Moreover, as discussed *infra*, Respondent sat silently by while his co-counsel indicated to the Court that entry of this Order and settlement of the case would conclude all "ancillary litigation" and further indicated that, upon entry of the Protective Order, the vacated Omnibus Discovery Order is "void *ab initio* and it could not and should not be used in any other litigation in any other context." Whether Movant should have remained suspicious of Respondent's intentions and motivations, Respondent never alerted this Court as to what he was actually planning. Indeed, it would have never occurred to this Court that Respondent, who had so vigorously sought the sealing of the Court's critical Order, was all the while planning to reveal the contents of this same Order in new litigation that he

was drafting at the very time he spoke to the Court.

Accordingly, the Court concludes that Respondent violated this Court's Order and that he did so intentionally. The next issue is whether Respondent should be cited for civil contempt as a result of his violation.

## II. SHOULD RESPONDENT BE HELD IN CONTEMPT AS A RESULT OF HIS VIOLATION OF THE MAY 20, 2003 ORDER?

### A. Remedial and Prospective Nature of Civil Contempt

■ This case is before the Court on a petition for civil contempt. Civil contempt proceedings are brought to enforce an order that requires the defendant to act in some defined manner. *Mercer v. Mitchell,* 908 F.2d 763, 768 (11th Cir.1990). If the conduct as alleged would violate the prior order, the Court enters a show cause order. *Id.* At the subsequent hearing on this show cause order, the defendant to the contempt charge is allowed to show either that he did not violate the order or that he was excused from complying. *Id.* at 769. Typically, where the second defense is offered, the defendant will ask for a modification of the order based on changed circumstances. *Id.*

■ In a contempt action, the moving party must prove by clear and convincing evidence that (1) a valid court order was in effect; (2) the order was clear and unambiguous; and (3) the alleged violator could

---

order to people who didn't already have it, and B, did not publicize it, which I did not do, and C, made an attempt to seal the proceedings so it would not get outside those people who already had the order. (*Id.* at 133.)

Respondent's definition is too narrow and is at odds with Respondent's own expressed concerns about the risk of wide-spread dis-

semination of a pleading filed on the internet based PACER network, which filing can reveal that document to thousands of internet subscribers, including news media subscribers. (*See, id.* at 112 (Wolk: "I was concerned that somebody, as they had already done in the State of Washington, would violate the Sealing Order.").)

have complied with the court's order, had he chosen to do so. *Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1296 (11th Cir. 2002); *see also American Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 581 (5th Cir.2000), *cert. denied*, 531 U.S. 1191, 121 S.Ct. 1190, 149 L.Ed.2d 106 (2001) ("A movant in a civil contempt proceeding bears the burden of establishing by clear and convincing evidence: (1) that a court order was in effect, (2) that the order required certain conduct by the respondent, and (3) that the respondent failed to comply with the court's order." (internal quotation and citation omitted)). "In determining whether a party is in contempt of a court order, the order is subject to reasonable interpretation." *Riccard*, 307 F.3d at 1296.

■■■ Of greatest immediate moment to the Court's determination whether to cite Respondent for civil contempt, however, is an examination of the purposes behind such a citation and a determination whether any valid purpose underlying the doctrine of civil contempt could be served by citing Respondent. As Respondent has correctly argued, whereas criminal contempt proceedings look back at past violations of an order and issue sanctions for this past disobedience, civil contempt proceedings look forward and, for the most part,[28] offer the prospect of sanctions only if further, future violations occur. This is so because civil contempt is remedial in nature, while criminal contempt is intended to be punitive. *See Int'l Union, United Mine Workers of America v. Bagwell*, 512 U.S. 821, 827, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994). In civil contempt, a court coerces future compliance with a court order from the contemnor by setting out sanctions that will befall the contemnor

should he fail to obey the order in the future. *Id.* For example, a person jailed for not paying alimony will be confined only until he pays the alimony due. *Id.* at 828, 114 S.Ct. 2552. If he pays the alimony promptly upon being ordered to do so, he will suffer no sanctions. *Id.* Alternatively, a contemnor can be assessed a fine to be paid daily until the contemnor complies with the court's order; as soon as he complies, fines are no longer assessed and the individual is no longer considered to be in contempt. *Id.* at 829, 114 S.Ct. 2552.

■■■ Thus, in civil contempt proceedings, a court cannot punish the subject of the action for his past violations of the order; instead, it must create *prospective* sanctions to induce obedience by the contemnor in the future. *See United States v. McCorkle*, 321 F.3d 1292, 1298–99 (11th Cir.2003); *In re E.I. DuPont De Nemours & Company–Benlate Litig.*, 99 F.3d 363, 368 (11th Cir.1996); *Martin v. Guillot*, 875 F.2d 839, 845 (11th Cir.1989). Moreover, no matter how a contempt proceeding is denominated, if the remedies imposed by the court are, in fact, punitive and designed to vindicate the court's authority, instead of being compensatory and intended to coerce compliance, then the contempt will be deemed to be criminal in nature. *In re E.I. DuPont De Nemours & Company–Benlate Litig.*, 99 F.3d at 368. Yet, a criminal contempt citation is akin to a criminal conviction and requires similar heightened Constitutional protections. *Id.* A court cannot therefore, even unwittingly, employ a civil contempt proceeding to impose what amounts to a criminal contempt sanction; if the court does so, the contempt citation is a nullity. *Id.* (citing *Blalock v. United States*, 844 F.2d 1546, 1560

---

28. Movant has argued that civil contempt caselaw still allows for the possibility of the assessment of attorney's fees against a contemnor guilty of past non-compliance, even if

no prospective coercive sanctions are imposed. The Court addresses this argument, *infra*.

n. 20 (11th Cir.1988) (per curiam) (Tjoflat, J., specially concurring)).

Accordingly, before issuing a civil contempt citation, a court must be able to identify the specific action that the contemnor is being directed to take or forego and then coerce compliance by setting out the sanctions that will befall the subject should he continue not to follow the court's order: a task that this Court now addresses.

**B. A Prospective Order Enjoining Any Further Disclosure or Publication of the Omnibus Discovery Order Would Effectively Enjoin Respondent from Prosecuting His Defamation Action**

 The Court's Protective Order directed that the Omnibus Discovery Order, which was vacated and sealed, not be publicized or disclosed; Movant has contended that Respondent violated this provision of the Protective Order through the allegations that he made in his Pennsylvania Complaint. The Court has concurred with Movant that Respondent did violate the Protective Order through these averments. The only future-looking, remedial tool available to the Court in this civil contempt proceeding, then, would be an Order to Respondent to cease the disclosure and/or publicizing of the Omnibus Discovery Order, else face fines or incarceration.[29] The

intended effect of such an Order would be to coerce Respondent to delete the averments in the Pennsylvania Complaint that describe the Omnibus Discovery Order and otherwise to cease any future disclosure of the Order.

Both parties seem to agree, however, that Respondent cannot state a defamation claim under Pennsylvania rules of pleading, absent a summary of this Order. (*See* Hrg. Tr. [265] at 37, 41, 158–59, 161; *see also* Post–Hearing Br. of Teledyne Technologies, Inc. [267] at 10 (citing *Ersek v. Township of Springfield,* 822 F.Supp. 218, 223 (E.D.Pa.1993), aff'd, 102 F.3d 79 (3d Cir.1996)).) Indeed, Respondent has repeatedly and candidly noted the near impossibility of his efforts to comply with Pennsylvania rules of pleading, while at the same time not running afoul of the Protective Order's prohibition against disclosure of the Order. (*See* Hrg. Tr. [265] at 145, 158–59, 161.)

Moreover, whether or not Respondent could proceed with this litigation with such a gutted complaint, it is clear that he views the Omnibus Discovery Order as an important part of his defamation case. Accordingly, any litigation based on the facts averred in Respondent's Complaint will almost certainly involve a disclosure of that Order and, as the litigation is a public lawsuit for which Respondent has sought a

---

**29.** The Court disagrees with Respondent's contention that he has purged himself of any contempt by now having the Pennsylvania Complaint sealed. While it is true that the Eastern District of Pennsylvania has sealed the litigation, at Respondent's request (April 29, 2004 Order from Shapiro, J., attach. as Ex. 16 to Movant's Documentary Evidence filed with Consolidated Pre–Hearing Mem. [246]), there is no reason to believe that the Pennsylvania suit will remain sealed once that court lifts the stay imposed pending the conclusion of this contempt proceeding. Indeed, Judge Shapiro only sealed the proceedings "pending final judgment in the Contempt Ap-

plication now pending in the United States District Court for the Northern District of Georgia before Judge Carnes." (*Id.*) Movant has cited persuasive authority from the Third Circuit indicating that the Eastern District of Pennsylvania would not likely permit the litigation of its case under seal. *Cf. Mercer v. Mitchell,* 908 F.2d 763, 769 n. 10 (11th Cir. 1990) (even if a defendant who has previously not complied is in technical compliance at the time of the proceeding, a contempt citation may still lie if the defendant's prior conduct indicates that he will not continue to comply with the court's order).

public forum, a publicizing of the Order. Thus, an Order directing Respondent to purge these allegations from his Complaint and to refrain from any discussion of the Omnibus Discovery Order in the Pennsylvania litigation would presumably have the effect of enjoining him from pursuing a defamation suit. The Court must then determine whether an order that effectively enjoins the Pennsylvania litigation is appropriate here. If it is not, there will be nothing left for the Court to direct the Respondent to do, consistent with a civil contempt citation. Again, as this is not a criminal contempt proceeding, a punitive sanction for past disobedience is not available to the Court. Moreover, if this Court determines that it will not issue an order that effectively enjoins the litigation in Pennsylvania, it will then be required, as a necessary consequence, to vacate the Protective Order, at least in part, as Respondent's continued litigation of the Pennsylvania Complaint, and Movant's defense thereof, are inconsistent with the language of that Order.

### C. Is An Injunction Against A Continuation of the Pennsylvania Litigation Appropriate?

As noted, Movant initially requested injunctive relief against the continuation of the Pennsylvania litigation or, alternatively, an order by this Court vacating the Protective Order and unsealing the sealed matters in the *Taylor* litigation, including the Omnibus Discovery Order. Now, Movant has indicated that it will forego any request for injunctive relief in lieu of the Court vacating, in its entirety, the Protective Order and unsealing all matters below. *Supra* at 1334 n. 19.[30] The Movant, however, has requested that, given what it

views as Respondent's deceptive conduct in this matter, the Court nonetheless adjudicate Respondent in contempt before the Court vacates or modifies the Omnibus Discovery Order. Respondent disagrees that an injunction or citation of contempt is appropriate and asks instead that the Court modify the Protective Order to allow Respondent to continue with his Pennsylvania litigation.

As the Court is not granting Movant all of its requested relief—the vacating of the Protective Order, in its entirety—and as Movant has not absolutely abandoned its request for injunctive relief, the Court will discuss the propriety of such relief as a framework to the Court's ultimate decision on the relief that it has granted. As noted *supra,* the Court has early in this litigation expressed its concern about issuing an Order enjoining or effectively enjoining litigation in another court. None of the participants in this contempt litigation have been able to find terribly apt authority—pro or con—but the drastic nature of such relief and its potentially negative impact on the comity between two co-equal courts should give any court, and has given this Court, pause. That uncertainty, combined with Respondent's oft-repeated incantation that the Protective Order was for his benefit and that "everyone" knew that Respondent intended to sue, prompted the Court to inquire whether instead of an injunction, the appropriate remedy in this case was a modification of the Protective Order. Also as noted *supra,* as the Court had preliminarily concluded, as a matter of law, that Respondent had disclosed and publicized the Omnibus Discovery Order through his Pennsylvania litigation, the Court recognized that, absent a modification, the

---

**30.** Movant has indicated that it does not abandon a request for injunctive relief, and has indicated its willingness to further brief the matter, upon the Court's request. Intervenors have briefed the issue, but candidly noted that there are few cases and that the ones cited are not terribly close on their facts: a not surprising revelation given the uniqueness of the facts in this case.

Court would be forced to enforce its Order, which would mean to hold Respondent in contempt and to effectively enjoin the Pennsylvania litigation.

Turning to the propriety of enjoining the Pennsylvania litigation—or its logical converse: modifying the Protective Order to allow that litigation to proceed—the Court ignores, for the moment, the evidence produced at the hearing concerning Respondent's arguable motivation in drafting the Protective Order as he did and concerning Movant's contention that Respondent attempted to lull and dupe Movant and this Court concerning Respondent's true motivation. Instead, the Court first focuses only on the protestation that Respondent has continued to make: to wit, as the non-disclosure provisions of the Protective Order were drafted by Respondent for his own protection, no good purpose is served by enforcing those provisions against Respondent, if he has now decided that he would like to publicly air the contents of the Omnibus Discovery Order. The Court believes that, taken by itself, Respondent's argument makes sense. After all, it is Respondent who did not want revealed the critical comments made about him in an Order that was ultimately vacated; neither this Court nor Movant had any interest in this matter.

Accordingly, given Respondent's frequent protestations that the non-disclosure provisions were for his protection and that Movant and Intervenors all knew that Respondent was about to sue them in Pennsylvania, the Court suggested that Respondent might wish to seek modification of the Protective Order. Given the fervor of Respondent's contentions, the Court thought it possible that Respondent would perhaps be able to demonstrate that the proposed Protective Order's application of the non-disclosure provisions to Respondent was a scrivener's error, whose enforcement would defeat the intention of the parties.

Such a showing would likely establish good cause to modify the Protective Order to allow Respondent's suit to continue, albeit the sealing provision in the Protective Order would also have to be changed.

Unfortunately, the evidence presented has not confirmed a benign explanation for the snafu that the Court thought might be possible. The evidence presented also did not corroborate Respondent's oft-repeated refrain that "everybody" knew that he would sue, even if he obtained an Order that seemingly prohibited such litigation. Additionally, the inclusion of language in the Order that held Respondent to its terms was not inadvertent. Instead, Respondent has now admitted that he purposefully and in a calculated manner drafted the Protective Order with provisions that covered him as well as Movant, knowing all the time that he was planning to file litigation that would be quite problematic given the Protective Order's prohibition on Respondent's disclosure of the Omnibus Discovery Order. Given what Movant contends to be deceptive conduct by Respondent and given Movant's purported reasonable reliance on the terms of the Protective Order as protecting it from future litigation, Movant argues that Respondent is estopped from seeking modifications in the Protective Order that would effectively allow him to file litigation based on an Order that he was not supposed to disclose or publicize. The Court turns to this contention by Respondent.

**D. Estoppel Given Respondent's Allegedly Deceptive Conduct**

**1. Who knew that Respondent would be suing Movant for defamation, notwithstanding the obtaining of the Protective Order?**

Respondent has consistently indicated that "everybody" knew that he would sue Movant for defamation, even if Movant agreed to entry of the Protective Order

and even if this Court signed such an Order. (Respondent's Br. in Supp. of Dismissal [268] at 9; Hrg. Tr. [265] at 56, 81–82, 107–08,170, 184.) The evidence did not play out exactly as Respondent has represented, however.

First, the evidence indicates that Respondent had no direct communications with Movant or Intervenors on the topic. Respondent has indicated that he wrote two letters indicating that he would sue Movant. Yet, neither the content nor the timing of these letters constituted notification that Respondent would sue Movant for defamation even if Movant agreed to vacating the Omnibus Discovery Order and even if the terms of the Protective Order seemed, as a practical matter, to render such litigation impossible. First, Respondent cites to a letter that he wrote in April 2002, some five months before this Court had even issued its Omnibus Discovery Order and when discovery disputes between the parties were ongoing. In that letter, Respondent was complaining about motions that Movant had filed alleging discovery abuse by Respondent's firm and threatening to sue all sorts of people as a result.[31] Clearly, this letter did not notify Movant of Respondent's intention to sue based on an Order that had not yet been entered. Second, Respondent cites to a letter that he wrote to an attorney for Movant in an unrelated case, in March, 2003. (Letter to Zeehandelaar from Wolk, attach. as Ex. 212 to Respondent's Consolidated Pre–Hearing Mem. [244].)[32] This cryptic suggestion in a letter in an unrelated case, written almost two months before the parties conferred with the Court concerning the Protective Order—indeed, apparently before there was any talk of a Protective Order—also did not provide the notification that Respondent ascribes to it.

Of more pertinence to this matter are the conversations that Respondent actually had concerning his intent to sue. The record is undisputed that the only person affiliated with Movant with whom he discussed this matter, or settlement at all, was Sharon Holahan, an official of the insurer of Movant's. (Hrg. Tr. [265] at 79, 80.) Ms. Holahan and Richard Genter, a member of Respondent's firm, ultimately negotiated the amount of the monetary settlement that the insurer would pay to the plaintiffs for the underlying case; agreement was largely reached on this figure prior to the conference with the Court on May 8, 2002. (Id. at 77, 237–38.) Indeed, as the insurer, Ms. Holahan had the legal authority to settle the case. (Holahan Dep. at 11.) What was left to be decided, however, was whether Movant would agree not to oppose Respondent's request that this Court vacate the Omni-

---

31. The April 11, 2002 letter to Movant's counsel, signed by Wolk, which was copied to Sharon Holahan, states, in pertinent part, the following:

I have your Reply Brief in Support of Teledyne's Motion to Compel.

If your law firm makes a personal attack on me or any other member of my firm again in any document filed in any court anywhere on this Earth, I will be the plaintiff in a lawsuit against each and everyone of you and each and every partner in Lord Bissell & Brook.

So there's no mistake or misunderstanding, every client you represent with whom we have a case, every partner in your firm, every insurer or person who directs that insurer's

work will be a defendant if you take a cheap shot at us again in any other document filed in court. In addition, I will personally file a grievance in every Bar Association, in every Supreme Court, and every other place in which you are licensed to practice law.

32. I have read your February 3, 2003 letter. For reasons that should be very clear to Teledyne, I cannot agree to such a stipulation because I do not trust what they say. In addition, they have attacked me personally and will shortly be defendants.

Accordingly, I think we are best to just litigate this case [Al–Amin et al. v. Textron Lycoming, et al.] (which is indefensible I might add) to its conclusion.

bus Discovery Order, in connection with the imminent settlement of the case. To that end, Respondent had approached Ms. Holahan and suggested some rapprochement with Movant "in the spirit of normalizing" their relationship, which conversation would include discussion of the *Taylor* case, as well as other cases that Respondent had against Movant. (*Id.* at 25.) Holahan indicated that in the past, Respondent had let some of her insureds, including Teledyne, out of cases even where they had some responsibility. "Normalization" of relations apparently meant that Respondent would consider doing so in the future. (*Id.* at 26–27.) Respondent has likewise testified that sometimes in the past he had given Movant a "pass" for incidents for which it might have had some legal responsibility; "normalization" of the relationship, to him, meant that he would continue to do so.[33] (Hrg. Tr. [265] at 170–71, 178.)

With regard to comments by Respondent or his colleague, Richard Genter, to Holahan prior to entry of the Protective

Order in May 2003, Holahan testified that she was aware through these conversations that Respondent was considering suing Movant,[34] although she was not clear about the type of suit. (Holahan Dep. at 67.) Likewise, Movant and some of its attorneys would have been aware that Wolk was considering litigation. (*Id.* at 63, 196.) Indeed, threats of suit from Respondent during litigation were not an unfamiliar phenomenon according to one Teledyne official, who said, "Arthur always says he's going to sue and that shouldn't be a concern." (*Id.* at 283. *See also id.* at 310–11 (Wolk had periodically told Holahan, in the past, that we was going to sue a variety of people at Teledyne over the Avweb matter).)

Holahan also knew that Respondent would not settle the case as long as the Omnibus Discovery Order remained and she knew that the existence of that Order was an impediment to her gaining a settlement for the dollar figure to which Respondent would apparently otherwise agree.[35] Moreover, it was Holahan's hope

**33.** This offer to "normalize" relationships was also apparently again broached by Respondent in early April, 2004, (*id.* at 302), several months after the filing of the Pennsylvania defamation action and shortly after this Court had denied Respondent's motion to dismiss the contempt application on March 22, 2004[214]. Although the testimony is not totally clear, it appears that Respondent, again using the insurer, Ms. Holahan, as his intermediary, wanted to approach Movant to "normalize" relationships by discussing the defamation case and "open up discussion on all of our cases." (Holahan Dep. at 140. *See generally id.* at 132–142.) Respondent purportedly indicated his willingness to discuss dismissing the pending defamation case. (*Id.* at 302–03.) Holahan communicated to a Teledyne official that Respondent "would probably be interested in...I don't know if I said dropping the lawsuit or...resolving." (*Id.* at 304.) She indicated that Respondent also said that he had four other cases pending with Teledyne and she indicated that "it might be good...if he [Wolk] had a business

interest in us." (*Id.* at 305–06.) The Teledyne official "automatically said, 'we don't trade one case for another.'" (*Id.* at 305. *See generally* 302–09.) The Pennsylvania defamation case is still pending.

**34.** Holahan Dep. at 62 ("it was always there when we were discussing the Order, the resolution, the release, the settlement, I think it was always there in the background as a possibility"); at 67–68 (regarding whether Respondent had indicated his intention to file a suit: "yes, I was aware that there was a— what would you call it? Something brewing or some—some unhappiness...amongst the Bar."); at 196 ("he [Wolk] would always say to me, 'I'm going to sue Teledyne, I'm going to sue Lord Bissell, I'm going to sue Mendes & Mount and I'm going to sue other people").

**35.** *Id.* at 199 (the case would not settle as long as the Order was out there); at 201 (Genter felt that the Order had to go away before the case would settle); at 243 (Hola-

that, if the Omnibus Discovery Order were vacated, Respondent would lose interest in the various other litigation[36] he had threatened. (*Id.* at 213 (Holahan was hopeful and optimistic that as a result of the vacation of the Order, there would be no further litigation).)

Arguably bolstering Holahan's hope that all litigation would be ended as a result of the vacating of the Omnibus Discovery Order, and the subsequent settlement, is the fact that Respondent never told her that he would engage in the threatened collateral litigation even if the above Order were withdrawn.[37] Certainly, had Respondent made such a statement, she would have communicated this to Movant. (*Id.* at 225, 227.) Further, Wolk never indicated that he required, as part of any settlement, a reservation of his right to engage in future collateral litigation. (*Id.* at 61–62.) On the other hand, Holahan never asked Genter or Respondent to affirmatively make such an assurance (*id.* at 68, 336), although she commented to Genter that if they settled, she did not want to be in a situation where there was a lawsuit in the future, but she did not demand any release to that effect. (*Id.* at 333.)

The testimony of Richard Genter, Wolk's former colleague, is largely consistent with Holahan's testimony. Genter would have told Holahan that Wolk would not settle the case as long as the Omnibus Discovery Order was in place. (Genter Dep. at 43–44, 70.) Genter also thinks that he told Holahan, prior to the settlement of the case, that Wolk was considering a defamation suit. (*Id.* at 60–61.) As to Wolk's intentions, Genter testified that some days Wolk would want to sue, some days he was less sure, and some days he might not want to sue; it was, according to Genter, a "dynamic thing." (*Id.* at 67–68.) Genter would have communicated this fluid dynamic to Holahan. (*Id.* at 68.)

Like Holahan, Genter hoped that Wolk would not sue anyone for defamation and he would have told her that the vacating of the Omnibus Discovery Order would help him persuade Wolk not to do so. (*Id.* at 84.[38] *See also id.* at 99 (with the vacating of the Order, Genter believed that he would have the ability to persuade Wolk, on a personal level, not to sue); 176–77 (Genter, as a friend, would try to persuade Wolk not to proceed with the other litigation), 169–73 (Genter was hopeful, as was Holahan, that vacating the Order would allow him to reason with Wolk about any future litigation).) Ultimately, however, Genter would have no power to control

---

han couldn't settle for the amount that she wanted with the Order in place).

**36.** Respondent had threatened other collateral litigation not related to the *Taylor* litigation. (*Id.* at 311, 313.)

**37.** *Id.* at 224 ("Q: Did Mr. Wolk or Mr. Genter tell you and make clear that even if the order was vacated, Mr. Wolk still intended to sue…?" A: "No, I doubt it.")

*See also id.* at 222–23 ("did I call Arthur Wolk and say, hey, are you going to—you know, are you going to not sue us if I agree to that [vacating Omnibus Discovery Order]? I could never do that and I didn't do that … All I can tell you is I believed that when the Order was vacated, that there would probably be no grounds for suit and I will also tell you that Teledyne was in the same—they knew—I don't know what I can say about that, but Teledyne knew as much as I did about the issue.")

**38.** Genter explains that vacating the Order would have given him the opportunity "on a personal level" to persuade Wolk not to exercise the rights he had reserved, i.e., the right to sue Movant and others. The Court notes that Wolk never "reserved" any rights in any document or oral averment he made to this Court. Again, there was simply no mention of any prospect of further litigation by anyone, and had there been, this Court would have never signed a Protective Order with the language presented to the Court. *See* discussion *infra.*

Wolk. (*Id.* at 85–86, 342–43 (always hoped Wolk wouldn't sue, but could not control him).)

Thus, at the point in time when Movant would be deciding whether to acquiesce in Respondent's request for this Court to enter the Protective Order he had drafted, Holahan and Genter's testimony is consistent as to their impression of Wolk's thoughts on a future defamation suit. From conversations with Wolk, both understood that he had not yet decided, and both hoped that the vacating of the Omnibus Discovery Order would cause him to decide to not only settle the *Taylor* case, but also not to pursue any collateral litigation arising out of it.

As to Movant's awareness of Wolk's intentions, it would have been aware of these intentions only through what Holahan told them, as she was the only person talking to Wolk or Genter. Indeed, Holahan and various officials of Teledyne held a telephone conference shortly before the conference with this Court on May 8, 2003, at which conference Respondent intended to persuade the Court to endorse his proposed Protective Order. Holahan testified that Movant was initially resistant to agreeing to having the Omnibus Discovery Order vacated and believed it not to be in their best interest. (Holahan Dep. at 253.) Holahan attempted to persuade them to agree, believing that the vacation of the Omnibus Discovery Order would lessen

the risk of any future litigation. (*Id.* at 254.) She could not remember whether she told Teledyne officials that their agreement to vacating the Order would lessen the risk of future litigation or make it go away, but she does not believe that she was guaranteeing anything. (*Id.* at 254–55. *See also id.* at 255–56 (Holahan does not remember if she said it would help eliminate the risk or would eliminate the risk).) Had she known that Wolk would sue regardless, she would not have made the comments she made. (*Id.* at 258.[39])

Holahan testified that initially these Teledyne officials indicated that Wolk's threats of litigation should not guide their decision and that the Omnibus Discovery Order could be useful in other litigation against Wolk. (*Id.* at 276.) Eventually, however, they agreed not to oppose Respondent's efforts to have this Court vacate the Omnibus Discovery Order and then "there was a lot of discussion of what—what words would be used." (*Id.* at 288.)

Therefore, as to the question in the heading of this discussion section—Who knew that Arthur Alan Wolk would be suing Movant for defamation, even if he got the Omnibus Discovery Order vacated—the answer is that no one but Arthur Alan Wolk, himself, knew for sure that he would still file a defamation suit, notwithstanding entry of the Protective Order. Nevertheless, Holahan and Movant were

**39.** Respondent has complained that he could not fully test Holahan's credibility because Movant asserted a privilege objection as to any notes taken by Holahan other than the notes of this meeting preceding the meeting with the Court. As the Court noted during the hearing, however, the only meeting that Respondent has established to have occurred before Movant agreed not to oppose the vacation of the Order—and the only meeting that counts—was the meeting that Holahan testified about that occurred shortly before the conference with this Court on May 8, 2003.

(*See* Hrg. Tr. [265] at 259–60.) Movant waived privilege as to that meeting. Moreover, Holahan would have been motivated to testify that she informed Movant of any firm intention by Wolk to sue, were that the case, because such disclosure would have insulated her from future legal action by Movant alleging that Holahan acted contrary to the interests of her insured, the Movant.

In any event, as Movant is not prevailing on its estoppel theory, *see infra,* Respondent's objection to Movant's assertion of privilege as to other notes is a moot matter.

on notice of the possibility that Respondent might still consider a lawsuit, even if the Omnibus Discovery Order was vacated. Moreover, even if Holahan, based on her friendly relationship with Respondent, had assured Movant that Respondent would not sue if Movant went along with vacating the Omnibus Discovery Order, Movant certainly had to know that Holahan could not bind Respondent.

### 2. Did Respondent Mislead the Court or Movant through language used in the proposed Protective Order and through statements he caused to be made at the May 8, 2003 Conference?

As Movant could not reasonably rely on an *assumption* that Respondent would not pursue collateral litigation if Movant agreed to vacating the Omnibus Discovery Order, Movant could succeed on an argument to enjoin litigation only if the language of the Protective Order, combined with Genter's representations, so bound Respondent.[40] Movant's argument in this regard does not rest solely on its arguably reasonable reliance on Respondent's duty to abide by the terms of the Protective Order, but also rests on its contention that because Respondent's conduct in obtaining the Protective Order was deceptive, he should not be rewarded with a modification of the Order, now that he has been caught violating it.

As the Court has already concluded, Respondent violated the Protective Order by disclosing and publicizing the Omnibus Discovery Order in his Pennsylvania litigation, and he will necessarily continue that violation as the litigation proceeds. The

record—most of it undisputed—supports Movant's assertion that, in seeking the Protective Order, Respondent did not candidly reveal his true intentions and, indeed, the only logical inference from the evidence is that Respondent actively attempted to disguise his future plans. First, as discussed *supra,* Respondent admitted that he intentionally drafted the Protective Order's prohibition against disclosing and publicizing the Omnibus Discovery Order to apply to both him and Movant. Thus, the inclusion of Respondent as a party covered by the prohibition was not inadvertent or a scrivener's error, as the Court had initially supposed when it suggested to Respondent that he consider moving for a modification of the Protective Order to avoid a contempt citation.

As discussed *supra,* Respondent has acknowledged that he drafted the anti-disclosure provisions of the Protective Order in a very calculated manner, with a dictionary by his side, to make sure that he chose just those right words that would allow him to sue Movant in the future based on the Omnibus Discovery Order, notwithstanding the Protective Order's prohibition of any disclosure of that Order. (Hrg. Tr. [265] at 111, 33.) Indeed, Respondent had always planned to sue, even if the Order were vacated. (*Id.* at 194–95.) To that end, he had required his associate to do months of research concerning defamation law. (*Id.* at 196.) Even with this careful parsing of words, Respondent admitted that it was still very difficult to mesh a Protective Order that prohibited disclosure of an Order with the pleading requirements of Pennsylvania defamation law that

---

**40.** Again, the Court notes its recognition that Movant is no longer pursuing, as its first line of attack, an effort to enjoin the Pennsylvania litigation. Yet, as Movant seeks to have this Court hold Respondent in contempt before the Court moves to a determination of whether to modify or vacate the Protective Order,

the Court necessarily must consider whether the only coercive sanction available to it—the injunction against further disclosure of the Omnibus Discovery Order, which will effectively stop the Pennsylvania litigation—is a sanction that would be appropriate in this case.

would seem to call for some disclosure. (*Id.* at 144–45 (tried to do minimum amount of summarization of Order, but just enough to comply with Pennsylvania 1019); at 36–37 (this pleading rule called for some summarization); at 41 (Wolk did not use the exact words in the Order); Wolk Dep. at 80–82 (admits trying to summarize).) Of course, this Court has concluded that he did not succeed.

Indeed, Respondent candidly admitted that, even with the care he took, drafting his Pennsylvania Complaint without running afoul of the Protective Order created a "difficult line to walk," "a fine line to walk." In trying to mesh the two, Respondent was "really in a jam;" he was between "a rock and a hard place." *Supra* at 1342. Of course, as Respondent was drafting the Protective Order and the Pennsylvania Complaint at the same time, there could have been no surprises down the road at the difficulties facing him. Given Respondent's continuing insistence that everyone knew that he was going to sue anyway, this Court inquired at the hearing as to why he had not foregone this tedious dictionary exercise and simply indicated plainly in the Protective Order that its prohibitions did not foreclose him from summarizing the Omnibus Discovery Order in a defamation suit:

The Court: You testified at length that you were very careful in drafting this May 20th Protective Order to draft it using words that would preserve your right to file a defamation suit. Therefore, you chose the words "publicize" and "disclose" after going to the dictionary and feeling that use of those words would still allow you to file your suit.

Have I captured your testimony accurately?

Wolk: I believe that's correct, Judge.

The Court: So my question to you is, if you were so conscientious and diligent to go to the dictionary before you drafted this order to be very careful about the words you chose, why didn't you simply put in the Protective Order "Except that Mr. Wolk may sue for defamation?" Wouldn't that have cleared this whole thing up?

Wolk: It sure would have, and in retrospect, Boy, I wish I had done it, because I probably wouldn't be sitting here.

(Hrg. Tr. [265] at 115.)

Movant has suggested, however, that the only conceivable reason for Respondent to have drafted the Protective Order in the way he did was to lull Movant, who would have also been aware of the pleading requirements for defamation actions, into believing that, with the Protective Order in place, Respondent would not be able to file a suit.[41] This Court likewise can

41. When Movant posed this question to Respondent, both at the deposition and the hearing, he was never able to give a very responsive answer, other than the familiar refrain that "everyone knew he would sue." At the deposition, counsel for Movant inquired:

Chiate: Isn't it true, Mr. Wolk, that the reason that you did not propose an Order that only limited the defendants from publicizing her Order was because you knew if you had done that, then the other parties would have recognized the risk that you would file a lawsuit for defamation?

Wolk: Oh, that's absurd. The other parties knew there was a risk. Not a risk. An intention. There wasn't—this is—this is the

most preposterous posturing I have ever heard a lawyer do. . . .

(Wolk Dep. at 101–02.) At the contempt hearing, counsel for Movant inquired:

Quinn: . . . To get back to the question that Judge Carnes asked this morning, the reason that you didn't put in that Order that you would still have the right to bring a lawsuit based on the fraudulent procurement and dissemination of the Order was you knew perfectly well there was no way that Teledyne was ever going to agree to that, isn't that true?

Wolk: That is just totally and completely wrong. . . .

(Hrg. Tr. [265] at 179.)

discern no other explanation for Respondent's drafting decisions, and he has been unable to otherwise explain his conduct.

Second, in addition to the above language in the Protective Order, Respondent, through his co-counsel, made representations to the Court indicating that there would be no more litigation. Specifically, in response to the Court's inquiry about future use of the Omnibus Discovery Order, were it vacated, Genter responded: "[I]f the Order is vacated, it's my understanding that it's void *ab initio* and *it could not and should not be used in any other litigation in any other context.*" (Transcript [156] at 18) (emphasis added). Granted, the Court had been inquiring about the ability to use the Order if Respondent were accused again of discovery violations, but Genter's response was emphatic and unambiguous. This Court understood Genter to mean just what he said when he indicated that, if vacated, the Order could not be used in future litigation in any other context. The Court had no awareness of any potential defamation suit and would have never dreamed that Respondent would want to resurrect the Omnibus Discovery Order in *any* litigation. Certainly, the Court could not have been expected to read Genter or Wolk's minds in order to discern Wolk's true unannounced intention.

In further advocating the Court to adopt Respondent's proposed order, Genter informed the Court that:

> Not responding directly to the question, Wolk then goes on to repeat his ultimate conclusion—that there was no question that he reserved his right to sue and to explain that Sharon Holahan's notes and testimony, as well as letters, discussions, and releases confirm that. (*Id.* at 179–80.) The Court, however, is aware of nothing in the record that demonstrates that Respondent ever discussed with Holahan, Genter, or Movant the reason why Respondent subjected himself to the non-

> [T]he Defendant, through Ms. Holahan (the insurer), has not yet made their best final offer because it's my understanding through discussions that there is some monetary value towards *closure of the entire litigation and all the ancillary motions and possible ancillary litigation.*

(*Id.* at 11 (emphasis added).) At the hearing, counsel for Movant, in questioning, inquired of Respondent as to what other conceivable meaning the phrase "possible ancillary litigation" could have, except to refer to the threatened defamation suit by Respondent.

> Quinn: What ancillary litigation could Mr. Genter have been referring to other than your threatened lawsuit relating to the Omnibus Discovery Order?

> Wolk: I'll have to think about that for a second.

> You know, I'm not sure I can answer that this moment. . . . I don't know what he had in mind . . . .

> Quinn: . . . . It's true, Sir, that sitting here right now, you can't think of any ancillary litigation he could have been referring to other than your threatened lawsuit against Teledyne relating to the alleged fraudulent procurement and dissemination of the Omnibus Discovery Order, true?

> Wolk: No. I don't think that's true.

> Quinn: Then name another one.

disclosure provision, if Respondent indeed wished to ultimately file a defamation lawsuit. Even had Respondent hoped that he might ultimately prevail on a contention that he had a right to sue, notwithstanding the provisions of the Protective Order, this hope is not inconsistent with an intent by Respondent to lull Movant into a belief that Respondent would be unable to sue, given the terms of the Order.

Wolk: Well, if you'll give me a moment, I mean you are hitting me cold with this and I'll have to think about it.

Quinn: Cold? This has been the subject of briefing with this Court leading up to this hearing, this very passage about ancillary motions, ancillary litigation, hasn't it?

Wolk: I don't know. I haven't done any briefing for this Court.

. . . .

Yeah, if you keep on talking, I won't be able to give you an answer. I've got to think about it for a second.

Quinn: Take as much time as you'd like, Sir.

Wolk: There was ancillary litigation that we felt was possible here that had nothing to do with my filing a lawsuit for myself and I am just trying to remember that ancillary litigation.

Quinn: Well, would you like to think about that and we'll come back to it, Sir?

Wolk: No, I'd like to give you an answer. . . .

(*Id.* at 203–04.) At that point, Respondent paused for an extremely long period of time, of approximately one minute's duration, and finally answered that the ancillary litigation that would be resolved by the settlement and Protective Order would be some litigation involving the employers of the plaintiffs concerning a Worker's Compensation dispute. (*Id.* at 205–07.) Like Movant, this Court has had difficulty understanding how this Worker's Compensation matter would fit logically within the "ancillary litigation" matter to which Genter referred.

In short, the Court concurs with Movant that Respondent, who was on the telephone line with Genter during the above cited remarks, left uncorrected statements to the Court that he knew had to be false,[42]

given his intentions at the time of the conference. That is, Respondent knew that he would be filing a defamation suit involving the Omnibus Discovery Order, so a statement that this Order could not be used in "any other litigation or in any other context" was a statement he knew to be at odds with his own plans. Likewise, Respondent knew that he did not intend closure of all ancillary litigation because he intended to sue Movant for defamation, notwithstanding the terms of the Protective Order. Thus, the Court concurs that Respondent was not candid with the Court as to his future plans and knowingly allowed the Court to be provided with information that he knew to be misleading.

3. **Would Respondent's above conduct be sufficient to warrant enjoining the Pennsylvania Litigation?**

Again, as noted, Movant has not briefed thoroughly the question whether Respondent, through the above conduct, would be estopped from pursuing the Pennsylvania litigation. Citing *Whetstone Candy Co., Inc. v. Kraft Foods, Inc.,* 351 F.3d 1067, 1076 (11th Cir.2003), Movant does note that estoppel "consists of words or conduct which causes another person to believe a certain state of things exists, and to consequently change his or her position in an adverse way." Movant argues that it reasonably believed that Respondent would have been unable to file a defamation suit, given the pleading requirements for defamation in Pennsylvania, and, at the same time, stay in compliance with the Protective Order, which prohibited disclosure of the Omnibus Discovery Order. Given that reasonable inference, Movant changed its position in an arguably adverse way, by acceding to Respondent's request that the

---

**42.** Unlike Movant, this Court does not necessarily conclude that the same assessment

should be made of Mr. Genter. *See infra* at 1367 n. 50.

Omnibus Discovery Order be vacated and sealed.

The novel question before this Court, however, is whether a court should declare a potential cause of action to be settled based on a protective order that does not directly so provide, but that does create conditions that are inconsistent with the bringing of the second claim. This Court thinks not, at least on the facts of this case. Movant has persuaded this Court that Movant would have never agreed to vacating the Omnibus Discovery Order, as Respondent requested it to do, had Movant believed that Respondent would turn around and sue Movant based on this same now-vacated Order. Whether the settlement figure agreed upon by Respondent and his clients represented a good or bad deal for the defendants in the *Taylor* case, that settlement would be paid by the insurer, not Movant. As Movant has argued, there would have been no logical reason to give Respondent something of value—Movant's agreement to not oppose the vacating of the Order—were the end result of that accommodation another lawsuit against Movant based on this Order. Under that scenario, Movant would not only have failed to receive anything of value for its gesture, but Movant would have suffered a clear detriment as a result of its action. Also, Movant would have never agreed to sealing the Order and related proceedings, had it known that it would shortly be a defendant in a Pennsylvania court, with the need to rely on these sealed matters for its defense.

Respondent has contended, however, that Movant's incentive for its acquiescence in Respondent's request to this Court was the chance to "normalize" relations with Respondent. As described *supra*, a normalization of relations meant that the parties would view each other more amicably and that sometimes Respondent might give Movant a "pass" on

potential litigation, if Respondent viewed that to be appropriate. Of course, Respondent also contends that, at the same time Movant was electing to acquiesce in Respondent's request to vacate the Omnibus Discovery Order to "normalize" relations, Movant also knew that Respondent would soon be suing Movant for defamation based on that same Order. Yet, these same two motivations that Respondent simultaneously ascribe to Movant are inconsistent, for how could Movant believe that it was acting to normalize its relationship with Respondent and obtain possible "passes" on some undefined future litigation, when it also knew that the immediate result of this decision would be the certainty of another acrimonious lawsuit with Respondent, to be filed in the near future?

 Thus, the Court concludes that the only logical explanation for Respondent's drafting decisions and representations to the Court was an attempt to lull Movant into a false sense of security about the unlikely prospects of a future defamation suit. Yet, even so, Movant is a sophisticated litigant who believed Respondent to be an aggressive, untrustworthy adversary. Albeit perhaps not directly to Movant, Respondent had been making noises about suing Movant for defamation. Negotiation further with Respondent on this matter may have been unpleasant, and perhaps Movant felt protected by the language in the proposed vacating order. Yet, had Movant wanted to nail down firmly Respondent's inability to sue in the future, Movant should have done so. A settlement agreement is a contract under Georgia law, subject to the same requirements regarding formation and enforceability as any other contract. *Griffin v. Wallace*, 260 Ga.App. 857, 860, 581 S.E.2d 375 (2003); *Johnson v. Gwinnett County*, 215 Ga.App. 79, 449 S.E.2d 856 (1994). Had the terms contained in the Protective

Order been instead contained in a settlement agreement, Movant may or may not have prevailed in its contention that Respondent could not bring the defamation suit. Yet, as these terms were contained in an Order entered by the Court, Movant had to be aware that the Court would always be free to modify the Order, upon an appropriate showing. The prohibitions against publicizing and disclosing the vacated-Order were thus not written in stone, as would be a contractual agreement with Respondent. In short, the Court concludes that Movant could have formally obtained an explicit agreement from Respondent not to bring a defamation suit: its failure to do so undermines Movant's contention that its reliance was reasonable and thereby defeats Movant's estoppel argument.

4. **Who prevails when Respondent brings "unclean hands" in his request to modify the Protective Order, but when Movant has also failed to demonstrate that Respondent should be estopped from pursuing collateral litigation, based on the Protective Order?**

As noted, the Court had thought it possible, given Respondent's oft-repeated prehearing protestations, that Respondent would be able to demonstrate a benign explanation for his non-compliance with the Protective Order. As discussed *supra*, the evidence is to the contrary. Given Respondent's above-described misleading conduct in obtaining the Protective Order, Respondent does not bring "clean hands" to his request for a modification of the Protective Order. As noted, at the same time the Respondent was requesting that the Court vacate, as untrue, an Order that had accused him of gamesmanship and disrespect for the Court's directives, Respondent was covertly planning to embark on conduct that, by his own admission,

would put him on a collision course with the terms of the very vacating Order that he was then seeking. Such conduct hardly meets a good cause standard. Moreover, in the typical case where a defendant in a contempt action seeks modification of an order that he has been violating, the defendant argues that changed circumstances exist that would make strict enforcement of the order unjust and that therefore justify modification. *See e.g., Mercer v. Mitchell,* 908 F.2d 763, 768 (11th Cir.1990). The only circumstance that has changed here is that the Court and Movant are now aware of what Respondent's true intentions were when he proposed the Protective Order. On the evidence before the Court, it is difficult to say that it would be "unjust" to hold Respondent to language that he drafted and to which he agreed.

■■■ On the other hand, as noted above, the Court disagrees that Movant has shown reasonable reliance on the terms of the Protective Order sufficient to justify its failure to obtain a formal agreement from Respondent explicitly waiving the right to file further litigation. Balancing these two unappealing positions against each other, the Court determines that it is inappropriate for the Court to enforce the Protective Order to enjoin litigation arising out of the vacated Omnibus Discovery Order. Given that determination, the Court is then forced, by default, to modify the Protective Order to delete the non-disclosure provisions, thereby allowing Respondent to pursue the defamation litigation.

The Court takes this action for the following reasons. First, making the Court's task easier is the fact that Movant no longer seeks an injunction against the Pennsylvania litigation, at least as its preferred relief. Second, the Court is persuaded by Respondent's argument that the ostensible purpose of the anti-disclosure

provisions—whatever lulling effect they may have had—was to protect Respondent, not Movant, from further disclosures. Third, as the Court has rejected Movant's estoppel argument—meaning that the Protective Order will not be read as prohibiting future legal action—the Order simply prohibits the disclosure and publicizing of the Omnibus Discovery Order. Movant suffers no harm from the disclosure or publicizing of the Omnibus Discovery Order that has, and will occur, through Respondent's litigation of the defamation action.

That Movant has suffered no harm from Respondent's disclosure of the Omnibus Discovery Order does not mean, however, that no harm has occurred. Whenever a litigant treats cavalierly an order of a court, harm results both through the disrespect that such conduct demonstrates, as well as the expenditure of scarce court resources to referee the litigation that results from such brinkmanship. Yet, this is harm primarily to the Court, not to Movant, and the Court concludes that Movant should not receive an injunction of the collateral litigation on this basis.

### 5. Should the Court nonetheless adjudicate the Application for Contempt prior to any modification of the Protective Order?

Movant has requested that, before vacating or modifying the Protective Order, the Court should first hold Respondent in contempt. Movant argues that, otherwise, Respondent, who has engaged in misleading conduct and who has violated the Order, will be rewarded with the remedy he seeks: modification of the Order. There is some resonance to Movant's argument. Nevertheless, the Court reiterates that it is proceeding on civil contempt, not criminal contempt. Thus, it is inappropriate for the Court to sanction Respondent for past non-compliant conduct. As the Court is modifying the Protective Order so that Respondent can pursue his litigation, there is nothing further that the Court can direct Respondent to do, or refrain from doing, to avoid a contempt citation. While, in theory, the Court could find Respondent in contempt for the few minutes of time it would take to read down further in the Order and see that the Court had modified the Order, such that Respondent was no longer in contempt, it would obviously be inappropriate to saddle Respondent with a contempt citation based on such a metaphysical exercise. *Cf. Mercer*, 908 F.2d at 768 (if the court determines that the order should be modified and that the defendant's conduct did not violate the order *as modified*, then ordinarily it would be unjust to hold the defendant in contempt)(emphasis in original).

Movant also argues that civil contempt remedies are not limited to sanctions designed to coerce future behavior, but that, instead, a contemnor who has brought himself into compliance by the time of a contempt hearing may still be required to compensate the opposing party for the litigation expenses that the latter underwent in insuring compliance. *See, e.g., Abbott Labs. v. Unlimited Beverages, Inc.*, 218 F.3d 1238, 1242 (11th Cir.2000) (where infringer found in contempt, court could assess attorney's fees and require the disgorgement of past profits); *Sizzler Family Steak Houses v. Western Sizzlin Steak House, Inc.*, 793 F.2d 1529, 1534 (11th Cir.1986) (could impose attorney's fees even if infringer was in compliance by the time of the hearing to allow the prevailing litigant the opportunity to collect expenses incurred in successful policing of compliance); *United States v. Int'l Bhd. of Teamsters*, 899 F.2d 143, 149 (2d Cir.1990) (where defendant purged himself of contempt shortly after the contempt citations, the plaintiff could be compensated for losses resulting from past non-compliance).

In the above cases, however, the act that the contemnor was being directed to refrain from doing remained in effect following the contempt proceedings. Here, the Court has modified the Order such that Respondent may now, consistent with the revised Vacating Order, proceed with the Pennsylvania litigation.[43] Thus, while Movant incurred expenses to vindicate this Court's Order, it did not incur expenses to insure that any harm to it cease, as this Court has modified the Order and Movant has suffered no harm that this Court has deemed cognizable through Respondent's disclosure and publication of the Omnibus Discovery Order. Accordingly, the Court concludes that applicable caselaw suggests that it would be inappropriate to assess attorney's fees based on an order that has been modified or to assess such fees in order to bootstrap a contempt citation that would otherwise not be issued. The Court will consider, *infra*, Movant's request for the imposition of attorney's fees against Respondent based on the Court's "inherent authority."

In summary, the Court **DENIES** Movant's application for a contempt citation, but grants, in part, their request to vacate the Protective Order, as discussed below.

## III. MODIFICATION OF PROTECTIVE ORDER

Respondent has requested that this Court modify the Protective Order, if the Court concludes that he would otherwise be in violation of the Order as now written, to allow him to continue with his Pennsylvania litigation. Movant, however, has asked that this Court vacate the May 20, 2003 Protective Order in its entirety. The Court will modify the Protective Order to allow Respondent to continue his litigation. The Court will accomplish this by vacating all provisions of that Order that forbade the disclosure or publicizing of the Order. Moreover, the Court will vacate the Protective Order in its entirety, save one significant provision that Movant asks to be deleted, but that the Court maintains. The Court now discusses how it will modify the components of the May 20, 2003 Protective Order in the revised Order that it will also issue this date. In its analysis, the Court has attempted to redraft this Order as the Court would have originally drafted it, had the Court known all of the facts at that time.

### A. Vacating the September 30, 2002 Omnibus Discovery Order

The most significant part of the May 20, 2003 Protective Order was that part which vacated the September 30, 2002 Omnibus Discovery Order. Movant asks that this Court vacate the entire Protective Order, which would mean that the Omnibus Discovery Order would then be reinstated. The Court declines to do so, and notes the following.

First, Respondent has insisted repeatedly that the *Taylor* case would have never settled had the Omnibus Discovery Order not been vacated. For example, in his deposition, Respondent testified:

> *I would not have settled the Taylor case had there not been that provision, meaning that we were going to be able to sue them.* This Order had nothing to do with the *Taylor* case. Nothing. It

---

43. Granted Movant here persuaded the Court that Respondent had violated the Order and the modification of the Protective Order was not based on Respondent's show of good faith. Arguably, given his previous non-compliance, Respondent should have to pay for the privilege of having the Order modified. Nevertheless, the above line of authority seems to suggest the need to have prevailed on the contempt application. *See also Mercer,* 908 F.2d at 769 n. 10 (where a party that has flouted the order in the past is in compliance by the time of the hearing, the court may still punish through criminal contempt or issue coercive sanctions if concerns exist concerning future compliance).

had to do with something that I insisted wholly separate from the Taylor case.

The Order was false, it was disseminated falsely. It was there and used by Teledyne and its lawyers to destroy my reputation. That's what the Order was about. Suing them was discussed and was disclosed to them, had nothing to do with the Taylor case, except that *if they had insisted that we not do that, the Taylor case would still be pending. It would have been tried, you would have lost a lot of money.* Now I'm done. (Wolk Dep. at 106–07 (emphasis added). *Accord, id.* at 99–100 (would have been no settlement without entry of Protective Order); Hrg. Tr. [265] at 78 (dual responsibility of settling case for clients and getting rid of Omnibus Discovery Order); Genter Dep. at 71 (for case to settle, the Omnibus Discovery Order needed to be vacated); *id.* at 42–45 (the same).)

Thus, it is clear that Respondent considered the vacating of the Omnibus Discovery Order to be an essential *quid pro quo* for his approval of any settlement. Yet, as noted *supra,* Movant has also argued persuasively that it would have never agreed to acquiesce in the vacation of the Order had it believed it would nonetheless be sued based on that same Order in the future. Movant seemingly argues that if its own expectation was defeated, Respondent's motivation is entitled to no greater protection. This position makes some sense and the Court tends to agree that any argument of a *quid pro quo* by either side would be a wash here.

Movant also argues that given Respondent's deceptive conduct in obtaining the Protective Order, it is appropriate that the entire Protective Order be vacated: meaning that the Omnibus Discovery Order would be reinstated. As noted *supra,* it is clear that Respondent was not candid in his dealings with the Court about his future intentions and that he acted in contravention of the terms of the Protective Order. Nevertheless, the Court believes that undoing that part of the Protective Order that vacated the Omnibus Discovery Order would be unfair to Respondent and would constitute a remedy that is not tailored to address the conduct that Respondent committed. Respondent filed a substantive motion for reconsideration of the Court's Omnibus Discovery Order. The Court never determined the merits of that motion because the case settled and the parties agreed to vacate the Omnibus Discovery Order without any determination of the merits of the motion to reconsider. As no resolution of the motion, on its merits, occurred, it is not possible to know now to what extent Respondent may have been successful in his motion for reconsideration, had the motion been litigated. Neither Respondent nor Movant can now complain about this, because both agreed to this method of proceeding.

Reinstatement of the Omnibus Discovery Order without a resolution of the motion for reconsideration would, however, have the same result as if Respondent had enjoyed no success in any respect in his motion for reconsideration: something that no one can definitively say would have occurred.[44] Yet, that Respondent was misleading, or even dishonest, in his obtaining of the Protective Order and that Respondent was cavalier about his own responsibilities under that Order does not mean that the Court would have denied, in its

---

44. The Court had indicated at the May 8, 2002 conference that were the motion for reconsideration to be litigated, the Court would be inclined, at the least, to modify the Omnibus Discovery Order to use the term "plaintiffs' counsel," rather than any individual attorney's name to avoid the "unseemly" prospect of a hearing where the owner of a law firm and his terminated associate would be pointing fingers at each other. *See supra* at 1328–29.

entirety, his motion for reconsideration of the Omnibus Discovery Order, had the latter been acted on. The two matters trigger different inquiries. Accordingly, the Court maintains that part of the Protective Order that vacates the Omnibus Discovery Order.

On the other hand, Movant should not be disadvantaged in the upcoming defamation suit, in *any* respect, by the Court's vacating of the Omnibus Discovery Order. Indeed, it is reasonable to now wonder whether part of Respondent's motivation in seeking the Protective Order was to create such a disadvantage by being able to argue that, in vacating the Omnibus Discovery Order, this Court was making a finding, on the merits, that Respondent was guilty of no discovery violations: something which clearly the Court did not do. *See* supra at 1327–29. Respondent's efforts to create such a misleading impression, if such was his intent, were also aided by those provisions of the Protective Order that he included to seal that part of the record dealing with the proceedings involved in vacating the Order. As Movant has argued, with these sealed records, Respondent has been able to characterize these proceedings in a misleading fashion, without Movant being able to contradict that assertion with the pertinent parts of the record.[45]

Accordingly, to ensure that Movant is not unfairly disadvantaged by the vacating of the Omnibus Discovery Order, the Court will make explicit in its revised order that the vacating of the Omnibus Discovery Order is effective *May 20, 2003:* the date the Protective Order was originally entered. This effective date means that, at the time Movant allegedly distributed the Omnibus Discovery Order to fellow aviation defense attorneys, the Omnibus Discovery Order was in effect.

**B. Deletion of Provisions Regarding Disclosing and Publicizing the Omnibus Discovery Order**

As Respondent has now chosen to disclose and publicize the Omnibus Discovery Order—and has indicated his intention to so utilize the Omnibus Discovery Order in fora other than the Eastern District of Pennsylvania—there is no longer any reason to keep these provisions in the revised Vacating Order and the Court deletes any such provision.

Similarly, the Court deletes the last paragraph of the Order, which paragraph indicated that, should the Omnibus Discovery Order be provided to any court in violation of the Protective Order, a copy of the Protective Order would be sufficient to indicate to that court to disregard the Omnibus Discovery Order in its entirety.[46]

---

**45.** For example, Respondent stated in his Pennsylvania Complaint that "[p]resumably recognizing that it had made a grievous error and the inappropriately harsh nature of its statements concerning the plaintiff, on October 21, 2002, the Northern District of Georgia sealed the opinion." (Am. Compl., attach. as Ex. 3 to Application for Order to Show Cause Why Arthur Alan Wolk Should Not Be Held in Contempt [175], at ¶ 81. *Accord id.* at ¶¶ 86–87 (by withdrawing its Order, this Court recognized that it had incorrectly interpreted plaintiffs' counsel to be non-compliant when, in reality, it was defense counsel's conduct that had created the problems), at ¶ 82 (by ultimately withdrawing its Order, this Court

presumably recognized that its statements were made in error).) Movant argues that the sealed proceedings make clear that this assertion is not supported by the record.

**46.** The Court notes that Respondent had originally proposed language providing that a copy of the Protective Order would be sufficient to *recommend* that this other court disregard the Omnibus Discovery Order. (*See* Transcript, May 20, 2003 Telephone Conference [169] at 3.) It was this Court that suggested strengthening the language, for the purpose of offering more protection to Respondent, to indicate that "a copy of this Order *shall* be sufficient to indicate to that

Given the numerous, varied uses that Respondent claims he now wishes to make of the Omnibus Discovery Order, the Court deems it inappropriate to micromanage what use a future court may make of the Order. *See* supra at 1336–37. As the Order is vacated, however, the Court can envision few affirmative uses that an adversary might appropriately make of the Order, but, given the history of this case, the Court declines to make any pronouncements based on assumptions that may later turn out to be untrue.

### C. Deleting the Sealing Provisions of the Omnibus Discovery Order

Respondent has repeatedly requested that this Court continue to maintain the sealing provisions of the Protective Order, which provisions direct that the Omnibus Discovery Order and related proceedings and pleadings remain sealed. Respondent's legal memoranda contain little discussion of the legal considerations that should guide the Court. Instead, Respondent has expressed a practical concern that the unsealing of this Order could damage his professional reputation as he expects that Movant or other adversaries may use this Order in an attempt to deny him *pro hac vice* status in future litigation or otherwise discredit him during litigation. Respondent indicates that his need to keep this Order under seal is akin to a corporation's need to protect its trade secrets. Finally, Respondent indicates that he has had no opportunity to challenge the accuracy of the findings of the Omnibus Discovery Order at a hearing. (Resp.'s Legal Mem. [244] at E–38–39.)

Movant opposes Respondent's request, noting that the public has a right of access to court proceedings, which right includes the inspection of court records; in support, Movant cites *Chicago Tribune Co. v. Bridgestone/Firestone, Inc.*, 263 F.3d 1304, 1311 (11th Cir.2001). Movant argues that there is neither "good cause" nor a "compelling interest" under Eleventh Circuit caselaw for allowing these matters to remain under seal.[47] To the contrary, Movant contends that the sealed matters must be unsealed to allow Movant to defend itself. (Pre–Hearing Legal Mem., attach. as Tab E to Consolidated Pre–Hearing Mem. of Teledyne Technologies, Inc. [246] at 27–30.) In addition, Movant notes that caselaw from the Third Circuit strongly suggests that the Eastern District of Pennsylvania would be reluctant to allow the litigation of these matters in secret, as Respondent appears to suggest. (*Id.* at

---

court that it be disregarded in its entirety." (*Id.*)

**47.** The *Chicago Tribune* holding recognized a "good cause" standard in the case before it, where the issue was the sealing of documents produced during discovery. *Supra*, 263 F.3d at 1312. The panel distinguished its case from two prior cases in which the court had set down a much tougher standard for sealing documents. *Id.* at 1311–12 (distinguishing *Brown v. Advantage Eng'g, Inc.*, 960 F.2d 1013 (11th Cir.1992) and *Wilson v. American Motors Corp.*, 759 F.2d 1568 (11th Cir.1985)). In *Brown* and *Wilson*, on the facts in those cases, the Eleventh Circuit articulated a higher standard a party seeking to seal, or have kept sealed, court documents must meet: " 'where, as in the present case, the [court]

attempts to deny access in order to inhibit the disclosure of sensitive information, *it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to that interest.*' " *Wilson*, 759 F.2d at 1571 (quoting *Newman v. Graddick*, 696 F.2d 796, 802 (11th Cir.1983) (quoting *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 606–07, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982))) (emphasis added); *see also Brown*, 960 F.2d at 1015–16 (same). In *Brown* and *Wilson*, the courts sealed the entire records (as opposed to the limited number of sealed documents produced during discovery in *Chicago Tribune*) as part of the settlement agreements. The circuit court, in both cases, overruled the district judges' sealing order.

11–13.) This caselaw, Movant contends, recognizes both a First Amendment right and a common law right of access to civil proceedings and holds that documents submitted in a civil proceeding are presumptively open. (*Id.* at 11–12.) Even would the caselaw *permit* the continued sealing of these matters, Movant argues, it would be greatly unfair to Movant to put it in this position, for Respondent "has made public allegations of false statements and deceit by Teledyne and its lawyers [who] must clear their names as well." (*Id.* at 30.)

The Court does not engage in a lengthy discussion of caselaw concerning the public's right of access to court proceedings because the parties have not done so and such a discussion is not necessary for an explanation of the result reached here. Specifically, the above caselaw set standards for determining when a district court's decision to seal parts of the record runs afoul of First Amendment and common law protections. Respondent has cited no caselaw indicating that the Court must seal documents that it does not believe should be sealed. This Court finds no good cause to seal these records and concludes that all sealed matters in this case should be unsealed.

As to Respondent's practical concerns about the need to seal the Omnibus Discovery Order and other pleadings, these concerns are not persuasive. Respondent contends that future adversaries will be able to use the Omnibus Discovery Order to deny him *pro hac vice* status. Yet, the Court has denied Movant's request to reinstate the Omnibus Discovery Order, and that Order is vacated.[48] This Court doubts that a district court would deny *pro hac vice* status based on a vacated order or would think well of a litigant who advances a vacated order for that purpose.

Respondent also argues that this Court has made statements in previous Orders in this contempt matter that serve to reaffirm the findings in the Omnibus Discovery Order. The Court notes that it has not been this Court's intention to do so. Given the nature of some of Respondent's motions and his own continuing discussion of the Omnibus Discovery Order, however, the Court has been forced to touch on its contents on occasion, but references to the substance of that Order have been as minimal as possible. At any rate, the Court's vacation of the Omnibus Discovery Order is without qualification, and this Order is sufficient to indicate that.

Respondent also continues to argue that it would be unfair to unseal the Omnibus Discovery Order because Respondent has had no opportunity to have a hearing at which he could challenge its findings. This argument is completely unfounded. It was Respondent who broached with the Court the possibility of summarily vacating the Omnibus Discovery Order, as an "impediment" to settlement of the case. Thus, Respondent was well aware that there would be no further hearings on this matter, and it was his choice to proceed in this manner. Moreover, the Court repeats that, through this mechanism, Respondent achieved a total vacation of the Order. He could not have expected any better result after a hearing.

Finally, as Movant correctly notes, Respondent has no one to blame but himself for the unsealing of the Order. In May of 2003, Respondent had succeeded in settling his case, having the Omnibus Discovery Order vacated, and also having that Order and related proceedings sealed.

48. The Court will affix a cover page to that Order so indicating, and the docket entry will also reflect this fact.

The matter was over and would have stayed that way had Respondent not been intent on continuing his long-running quarrel with Movant, through a defamation suit. Having filed this suit, and having disclosed the substance of the Omnibus Discovery Order in his Complaint, Respondent cannot be surprised that Movant might wish to defend itself with the sealed Order and proceedings. Indeed, although Respondent now allows for the possibility of a limited sealing order to be used in the Pennsylvania litigation, this Court is not at all certain how one would seal, in a limited fashion, these matters that will be central to litigation of Respondent's defamation claim. Presumably, a trial at which these matters are discussed would not be closed to the public. Certainly, this Court does not wish to tie the hands of the district court judge in the Eastern District of Pennsylvania through an improvidently-granted sealing order.

More importantly, though, as Movant notes, Respondent has sued Movant in a public proceeding and is seeking a public verdict against Movant. Movant should have the same right to present its defense publicly. In short, the Court concludes that Respondent has forfeited any right to now ask that these matters remain sealed.[49]

As noted *supra*, the Court must now draft the vacating order that the Court would have fashioned had Respondent been candid with the Court. Had Respondent told the Court that he intended to sue Movant after he achieved a vacation of the Omnibus Discovery Order, this Court would have never entertained a request to seal anything in this record. That being

so, the Court directs that the Omnibus Discovery Order and all the related matters be **unsealed**.

To avoid running afoul of the Protective Order, Movant filed its Application for Contempt under Seal, and Respondent has followed suit. Thus, most of the pleadings in this contempt matter have been filed under seal. Likewise, as one of Respondent's requests was that the Omnibus Discovery Order and related matters remain under seal, the Court allowed this and filed some of its own Orders under seal to avoid any perception that it was deciding against Respondent's request prior to allowing him a full opportunity to be heard. As the proceedings before this Court are now concluded, the Court **unseals** all previously sealed matters in the contempt application.

To allow Respondent an opportunity to challenge this ruling in the Eleventh Circuit, the Court will **STAY** its order unsealing the Omnibus Discovery Order and related pleadings for **twenty (20) days**. As some of the filings of the parties may contain materials that would be impacted by the Eleventh Circuit's ruling, the Court will likewise stay its unsealing of any pleadings filed by the litigants in this contempt proceeding. The Court will, however, **immediately unseal any Orders** that it has previously issued in this contempt proceeding.

### D. New Vacating Order

The revised vacating Order, issued this date by the Court, shall read as follows:

The Court does hereby revoke and vacate its Order of September 30, 2002, effective May 20, 2003. The Court also

---

**49.** As noted *supra*, Respondent has, himself, filed a motion for limited unsealing, in which he requests the right to present the Omnibus Discovery Order to Congressional committees, to use it in an upcoming book he plans to write, to use it in future litigation he plans

to file, and to show to a psychiatrist whom Respondent indicates he has already retained to psychoanalyze this Court. Given this request, Respondent cannot seriously contend that a sealing order would any longer be appropriate.

revokes and vacates its previous Order of May 20, 2003.

## IV. ATTORNEY'S FEES

The Court has previously noted its conclusion that it could not assess attorney's fees as part of Movant's Contempt Application, as notwithstanding a determination that Respondent had violated the Protective Order, the Court had not cited him for contempt. *See supra* at 1360–61. Movant has also requested that this Court use its "inherent powers" to order Respondent to pay attorney's fees and costs as a sanction for Respondent's "fraud on the court."[50]

(Pre–Hearing Mem., attach. to Consolidated Pre–Hearing Mem. of Teledyne Technologies, Inc. [246] at 23–26.)[51]

Movant argues that this Court should exercise its inherent power because, among other things, Respondent engaged in misleading and fraudulent conduct by his failure to correct material statements made to the Court that he knew to be untrue and by drafting the Protective Order in a manner that would indicate that Respondent would be subject to the non-disclosure terms of the Protective Order, when Respondent knew that he never intended to abide by this part of the Order.

---

50. Movant has included Richard Genter, along with Respondent, in its allegation of fraud on the Court. While Respondent's conduct has already been noted and can be justifiably criticized, this Court takes a much less harsh view of Mr. Genter's conduct than does Movant. The Court recognizes that Mr. Genter was in a very difficult position. He was attempting to broker a resolution of this matter that would serve his employer, Respondent's, interest, which interest he did not believe was furthered by defamation litigation against Movant. *See supra* at 1352–53. When Genter stated that entry of the Protective Order would end all ancillary litigation and that a vacated Omnibus Discovery Order could not be used in any future litigation in any context, Respondent well knew that this was an untrue statement because, as he has testified, Respondent knew that he intended to sue Movant for defamation on this very same vacated order. Thus, as an officer of the Court, Respondent should have corrected the record. He, of course, likely concluded he could not do because, had he corrected the record, Movant would no longer have agreed to the resolution he proposed, nor would this Court have sealed any records. Thus, the Court has concluded that Respondent purposefully misled this Court.

Mr. Genter, on the other hand, did not *know*, absolutely, that the statement was untrue. In conversations with Genter, Respondent had been quite volatile concerning his expressed intention to sue, and Genter was never sure, from day to day, exactly what Respondent would do. Indeed, Genter intended to continue to try to persuade Respondent not to sue. Significantly, unlike Respon-

dent, Genter has not testified that he believed that Respondent could file the Pennsylvania litigation consistently with the terms of the Protective Order; instead, he indicated his inability to say whether filing that lawsuit violated the Protective Order. (Genter. Dep. at 318–26.) Thus, it is certainly conceivable that when he made the above statements to the Court, Genter viewed those statements as accurate because future litigation *would be* problematic, given the language of the Protective Order. Indeed, Genter in no way participated in the filing of the defamation suit and, in fact, left the firm, in an acrimonious parting, around the time the suit was filed. (*Id.* at 269–72.) He indicated that the *Taylor* litigation played a role in his departure. (*Id.* at 272–73.)

In short, it perhaps would have been better had Mr. Genter elaborated, but it was Respondent's, not Genter's, obligation to correct what only he could know were misstatements. Moreover, the Court notes that, in the short period of time he was in the *Taylor* case, Mr. Genter brought a tone of professionalism, courtesy, and reconciliation to the case that the Court welcomed.

51. In a footnote, Movant also cites, as supportive of its request for attorney's fees, 28 U.S.C. § 1927, which provides for the imposition of sanctions against an attorney who "so multiplies the proceedings in any case unreasonably and vexatiously." (Pre–Hearing Mem., attach. to Consolidated Pre–Hearing Mem. of Teledyne Technologies, Inc. [246] at 24 n. 7.)

Movant argues that Respondent's deceptive conduct, which has created much unnecessary work for Movant and this Court, warrants the imposition of this sanction.

 In the federal judicial system, which operates under the "American Rule," each litigant typically bears responsibility for his own attorney's fees. *Baynham v. PMI Mortgage*, 313 F.3d 1337, 1340 (11th Cir.2002). There are some exceptions to this American Rule, however, and one of those exceptions is found in the Court's "inherent power" to assess attorney's fees. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991); *Byrne v. Nezhat*, 261 F.3d 1075, 1106 (11th Cir.2001). This inherent power, however, must fall within three narrowly defined circumstances and, because of their "potency," these inherent powers must be exercised with "restraint and discretion." *Chambers*, 501 U.S. at 44–45, 111 S.Ct. 2123. The three narrowly defined circumstances under which a court possesses inherent power to impose attorney's fees are: (1) as part of the common fund exception; (2) as a sanction for the "willful disobedience of a court order"; and (3) "when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Pedraza v. United Guaranty Corp.*, 313 F.3d 1323, 1335 (11th Cir. 2002) (quoting *Chambers*, 501 U.S. at 45–46, 111 S.Ct. 2123 (internal quotations and citations omitted)).

The first circumstance is clearly not applicable. The second circumstance—willful disobedience of a court order—initially seems applicable. Yet, when one reads more carefully the limited caselaw, that initial assumption changes. That is, in *Chambers*, the Supreme Court indicated that attorney's fees may be an appropriate sanction for the willful disobedience of a court order, but in the next sentence, the Court indicated that "a court's discretion to determine '[t]he degree of punishment *for contempt*' permits the court to impose as part of the fine attorney's fees representing the entire cost of the litigation." *Chambers*, 501 U.S. at 45, 111 S.Ct. 2123 (citation omitted) (emphasis added). Thus, this second criterion appears to overlap with contempt, and, as noted *supra*, the Court has concluded that it lacks authority to impose attorney's fees as part of the contempt proceeding, as the Court did not cite Respondent for contempt, even though the Court concluded that he had violated the Court's Order. Indeed, in *Glatter v. Mroz*, 65 F.3d 1567 (11th Cir.1995), the panel noted that a court's ability to impose sanctions based on the third criterion—bad faith grounds—allows a Court to police itself without " 'resort to the more drastic sanctions available for contempt of court and mak[ing] the prevailing party whole for expenses caused by his opponent's obstinacy.' " *Id.* at 1575 (quoting *Chambers*, 501 U.S. at 46, 111 S.Ct. 2123).

 That leaves the third ground as the only available means of sanctioning Respondent for his conduct under the Court's inherent powers. This ground allows a court to assess attorney's fees where a party or lawyer has acted in "bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* While this standard sounds very broad, in fact, one finds few cases in which a sanction on this ground has been actually upheld. In the two cases cited by Movant, the misconduct was far more egregious than that committed here by Respondent.[52]

---

52. In *Chambers, supra,* a contract action, the breacher of a contract had gone to extraordinary lengths to defeat his opponent's ability to specifically enforce the contract, including fraudulently transferring the property to various entities as a device to defeat performance, denying inspection of corporate records, and numerous acts of "delay, oppression, harassment and massive expense to reduce plaintiff to exhausted compliance." 501 U.S. at 41, 111 S.Ct. 2123. In addition, the culpable party had previously been held in contempt

In short, the Court is uncertain that it is empowered to award fees under its inherent powers under these facts. The Court concludes that Respondent did act to mislead the Court and Movant, through the language he inserted into the Protective Order, and he allowed the Court to be misled as to his own construction of the Protective Order. Moreover, the Court cannot overstate the drain on its resources caused by Respondent's conduct and resulting proceedings. All of this could have been avoided, had Respondent merely been honest about his intentions.[53] Nevertheless, as noted *supra*, the Court is mindful that this is not a criminal contempt proceeding, in which a punitive sanction is allowed. The Court does not wish to indirectly convert a civil contempt proceeding into a criminal contempt proceeding through the imposition of a sanction that appears punitive. Accordingly, given the uncertainty of the Court's authority to impose sanctions on these facts, the Court declines to do so.

The Court further notes, however, that if Movant appeals, and if the Eleventh Circuit concludes that this Court has taken too cramped a notion of its powers, the Circuit Court will likely remand for a calculation of attorney's fees. Should that occur, this Court will reassign that task to another judge. This Court's primary goal has been to unravel the procedural morass that its Order, which was based on Respondent's misleading representations, has created. The Court believes it has done so with this Order and it would likely decline any further participation in a dispute involving this matter.

## V. MISCELLANEOUS ISSUES

### A. Respondent's Contention that He Should Have Been Permitted to Act *Pro Se*

In his post-hearing memorandum, Respondent takes issue with the Court's Order of May 14, 2004 requiring him to be represented by counsel at any future proceedings before the Court. (Respondent's Br. in Supp. of Dismissal [268] at 2.) Respondent had appeared throughout the contempt proceedings, along with two other attorneys: Jason T. Schneider, local counsel in the *Taylor* case, and Matthew Clarke, an associate at Respondent's law firm, whom the Court admitted *pro hac vice* on February 11, 2004. (*See* Docket No. 203.) The list below, which identifies the attorneys whose names have appeared on various pleadings, evidences that Respondent has enjoyed the representation of two other attorneys during this matter:

Response to Contempt Application [178]—Wolk and Schneider

Notice to attached Supplemental Affidavit in Support of Wolk's Response to Contempt Application [181]—Wolk and Schneider

---

and assessed a sanction of $25,000. In *Martin v. Automobili Lamborghini Exclusive, Inc.*, 307 F.3d 1332 (11th Cir.2002), in which the Eleventh Circuit upheld the imposition of sanctions, but found the sanctions to be too harsh, the plaintiff had filed a legal action based on an automobile that he did not own, which was deemed a "fraud upon the court." *Id.* at 1334–35.

**53.** Respondent argues that this proceeding could have been avoided had Movant just made one phone call. (Respondent's Br. in Supp. of Dismissal [268] at 14 ("a single phone call is all that it would have taken to resolve Teledyne's concern, as Wolk would have stipulated to limited unsealing to the parties in the Pennsylvania action for purposes of that action only and invited that act in the Pennsylvania complaints").) Yet, when Movant asked Respondent to agree to allow Movant to have a copy of the Omnibus Discovery Order for use in this hearing, he refused. (April 29, 2004 Letter from Clarke to Alger, attach. as Ex. B to Teledyne's Emergency Mot. for Access to Order of September 30, 2002 and Tr. of May 20, 2003 Teleconference [225].)

Motion to Dismiss Contempt Application [185]—Wolk and Schneider

Surreply in Opposition to Contempt Application [188]—Wolk and Schneider

Motion to Stay Discovery [194]—Wolk and Schneider

Response to Motion for Leave to Take Discovery [195]—Wolk and Schneider

Reply Memorandum in Support of Motion to Dismiss and Response to Motion to Strike [198]—Wolk and Schneider

Motion to Transfer and Recuse [199]—Wolk and Schneider

Clarke's pro hac vice Application [200]—Schneider

Response to Motion for Oral Argument [207]—Clarke and Schneider

Surreply in Opposition for Motion for Leave to Take Discovery [208]—Clarke and Schneider

Reply to Motion to Transfer and Recuse [210]—Clarke and Schneider

Surreply to Motion to Strike Motion to Dismiss [211]—Clarke and Schneider

Contempt Application Against Teledyne [218]—Wolk

Motion for Limited Unsealing [222]—Wolk

Motion to Vacate April 28, 2004 Order and For Recusal [223]—Wolk

Declaration in Support 222 and 223[224]—Wolk

Motion to Extend Discovery Time [228]—Wolk

Motion for Relief from Judgment [229]—Wolk

Motion for Sanctions [232]—Wolk

Motion for Summary Judgment [233]—Wolk

Emergency Motion to Compel [237]—Wolk

Respondent Arthur Alan Wolk's Consolidated Pre-Hearing Memorandum [244]—Clarke and Schneider

Respondent's Omnibus Response to Pre-Hearing Memoranda [256]—Clarke and Schneider

Emergency Motion for Leave to Continue to Act *Pro Se* [259]—Wolk

Respondent's Motion to Strike Teledyne's Witnesses and Evidence Listed in Its Pre-Hearing Memorandum which were Requested in Discovery But Not Provided on the Basis of Improper Privilege Assertions [260]—Wolk

Joint Exhibit List [264]—Wolk and Schneider

Brief in Support of Dismissal [268]—Wolk and Schneider

Supplemental Exhibit Lists—Wolk

Motion Pursuant to Rule 60[270]-Wolk and Schneider

On May 14, 2004, the Court informed Respondent that he needed to be represented by counsel in the contempt proceeding. (May 17, 2004 Order [239] at 13.) The Court stated that "as Respondent is the subject of this contempt petition, he should be represented by counsel at this conference and at any hearing or other proceeding that is held." (*Id.*) Also in this Order, the Court scheduled a pre-hearing telephone conference for June 1, 2004, 3:00 p.m., at which time the Court was to hear arguments as to any points of dispute in the pre-hearing memoranda. (*Id.* at 13.)

The Court held this telephone conference on June 1, 2004. Despite the Court's directive that Respondent be represented by counsel at the conference, Respondent twice attempted to address the Court directly. (Transcript, June 1, 2004 Telephone Conference [253] at 14–15, 25–26.) The first time he tried to speak, the Court responded that "I think it's better if you appear through counsel. You may telegraph anything you want to your co-counsel, but I believe it's better if you proceed through counsel." (*Id.* at 15.) Respondent's second interruption resulted in the following colloquy:

The Court: Mr. Wolk, the ground rules are that you are a party, so to speak, of this. I do not think it appropriate. I think you do need to speak through your lawyer, so I would ask that you—

Wolk: I am pro se now, your Honor. I just fired my lawyer.

The Court: Well, no, you are not pro se under our local rules when you have appeared through a lawyer until we let you come back. So you need to speak through your lawyer, who is also your co-counsel. So we need to have him speak, not you.

(*Id.* at 26.)

Despite the Court's clear instruction that Respondent be represented by counsel at the hearing, Respondent's local counsel did not intend to appear. Buried as an exhibit to Respondent's Pre–Hearing Memorandum, filed on May 24, 2004, is a declaration of Jason T. Schneider, in which he indicated that he might not appear at the June 3, 2004 hearing because of some vacation plans. (Decl. of Jason T. Schneider, attach. as Ex. 213 to Respondent Arthur Alan Wolk's Consolidated Pre–Hearing Memorandum [244], at ¶ 7.) In this buried document, Mr. Schneider did not formally request this Court's permission for this leave of absence; he simply announced that he probably would not be present. As a result, the Court had to expend more of its time to issue an Order directing local counsel to be present. (*See* June 1, 2004 Order [254] at 2.)

Then, approximately ten minutes prior to the start of the hearing, the Court received Respondent's Emergency Motion for Leave to Continue to Act Pro Se [259], although it is apparent that he had prepared the motion on the day before and could have served it on the Court in a more timely fashion. (*See* Transcript, June 30, 2004 Contempt Hearing, "Hrg. Tr." [265] at 9.) [54] At the beginning of the hearing, the Court orally denied the motion.[55] (*Id.* at 11–13.)

---

54. Around 3:00 p.m., on the day before the hearing, Respondent faxed the Court a courtesy copy of Respondent's Second Supplemental Exhibit List, signing the document "Arthur Alan Wolk, Respondent *Pro Se.*" At the same time, Respondent faxed a Certification for Compliance with the Font to the Court and opposing counsel that referenced a motion to continue pro se, but no motion was actually attached. (*Id.* at 9–10.) Thus, the motion had apparently been prepared on the preceding day, but was not served until immediately before the hearing.

55. The Court stated the following at the hearing in response to Respondent's motion for leave to act *pro se:*

All right. With regard to the emergency motion for leave to continue to act pro se filed at 9:50 this morning, I decline or deny the motion on several grounds.

One ground would be timeliness. The court issued an order on May 17th indicating that Mr. Wolk would have to appear through counsel. Ten minutes before the hearing starts is a bit late to address this matter.

Secondly, our local rules discourage or prohibit hybrid representation. I believe the first response we got with regard to the contempt proceeding was signed by Mr. Clarke and Mr. Schneider, not Mr. Wolk.

The entire purpose of the local rule is that when something goes awry with a pro hac vice counsel that local counsel or someone else be able to step in. It would defeat the entire purpose of the rule when you have a proceeding in which pro hac vice counsel is alleged to have been in contempt of a court order to say that suddenly the rules fly away and that attorney gets to be pro se. That would violate the whole spirit or purpose of the rule.

But the local rule does provide that only the court can allow an attorney who has attempted hybrid representation, which Mr. Wolk has, with him signing some pleadings and Mr. Schneider signing some and Mr. Clarke signing some, it would be my discretion whether or not to allow him to continue and I choose not to exercise my discretion for several reasons: I think the nature of the proceeding. I think Mr. Wolk clearly

Respondent has contended that the Court did not notify him of the need to appear through counsel until the June 1st telephone conference, two days before the contempt hearing, which Respondent indicates was insufficient notification. Although the Court had so directed Respondent in its May 14, 2004 Order, Respondent has argued that the Court used the word "should," which made the Respondent believe that the Court was just offering Respondent some advice, and was not actually telling him to have counsel. *See supra* at 1338 n. 22. This is, of course, a ridiculous argument and a further indication of Respondent's penchant for word parsing.

Respondent does not appear to dispute the substantive basis for the Court's Order, but the Court nonetheless sets it out. As noted in the telephone conference and at the contempt hearing, the Court's local rules discourage hybrid representation. The local rules provide:

> *Whenever a party has appeared by attorney, the party may not thereafter appear or act in the party's own behalf in the action or proceeding* or take any step therein *unless the party* has first given notice of the party's intention to

the attorney of record and to the opposing party *and has obtained an order of substitution from the court.*

LR 83.1D(2), NDGa. (emphasis added). As discussed *supra*, Respondent had appeared by attorney in this matter. Indeed, it was Mr. Schneider who actually signed the Response to Movant's Contempt Application [178]. Without an order of substitution from this Court, then, Respondent may not proceed *pro se*, even if he had given notice to his counsel of record and the opposing party. The Court issued no such order.

Local Rule 83.1D(2) goes on to state that "Notwithstanding this rule, the court may in its discretion hear a party in open court even though the party has previously appeared of is represented by attorney." *Id.* The Court chose not to exercise its discretion to allow Respondent to directly address the Court. The Court did so because Respondent clearly could retain counsel—and had two attorneys already representing him—and because of the tenor and content of Respondent's previous pleadings. (Hrg. Tr. [265] at 12.) Given the tone of these pleadings, the Court concluded that an orderly and dignified proceeding might not be possible if Respondent were acting as counsel.[56]

---

can retain counsel. Mr. Wolk clearly is confident and proud of the people in his firm and I am sure they can represent him well.

Since this motion has been made, I am not making these remarks gratuitously but I am responding to the motion. I think the tenor of the remarks Mr. Wolk has made in his pleadings that are, I think, inappropriate and disrespectful suggest to me it would not be the best use of this court's resources, nor would we have the smoothest sort of hearing, if those kinds of remarks were uttered in an open court proceeding or any court proceeding.

Secondly, having reviewed the depositions and seen what occurred there, it seems to me that it is necessarily quite difficult for a person who himself is the subject of the contempt to also represent

himself. The depositions got into pretty much a free-for-all at different times and I don't want that to happen here. So I think for the orderliness of the proceedings it would be best if we proceed through counsel as I previously ordered, so I deny the motion.

(*Id.* at 11–13.)

**56.** In addition, the Court has reviewed, at length, the depositions taken in this matter and they confirm the Court's concern that Respondent would be unable or unwilling to conduct himself in an appropriate manner at a hearing. *See, e.g.,* Holahan Dep. at 28 (Wolk says counsel would have to agree on something or "have to call, God forbid, Judge Carnes"); at 46 (Wolk indicates he will address a privilege question "with a judge. Not Judge Carnes, for sure;" at 47 (regarding a

Respondent's conduct since the contempt hearing has only served to confirm that concern. At the close of the hearing, the Court's instructed that no more motions be filed, but that should any emergency situation present itself, counsel first file a motion for leave to file a particular motion, but not the motion itself. (*Id.* at 343–44.) Notwithstanding this clear directive, Respondent filed a Rule 60 Motion [270] two (2) weeks after filing his post-hearing brief. He did not request leave, nor was there any emergency aspect to the motion; Respondent also acknowledged his awareness that he should not be filing the motion. The Court struck this motion and admonished Respondent for his disobedience. (July 19, 2004 Order [271].)

Likewise, the final matter addressed by the Court at the hearing had been Respondent's request to submit a supplemental affidavit from Genter. (Hrg. Tr. [266] at 348.) The parties and the Court discussed this issue, and the Court ruled that Respondent would not be allowed to submit a supplemental affidavit for a witness who had already been fully deposed and cross-examined.[57] (*Id.* at 348–49). Nevertheless, in direct defiance of the Court's instructions, Respondent filed a supplemental affidavit from Genter, attached as Exhibit 2 to Respondent's post-hearing memorandum.

In any event, Respondent has been able to have his say. He has filed numerous pleadings—twenty-eight (28) pleadings at last count, including three surreplies that are not permitted by local rule. He has filed duplicate pleadings and has hashed and rehashed his arguments repeatedly. At the hearing, he testified without limitation all day and had ample opportunity to state his position. The only thing Respondent was not allowed to do at the hearing was to question the one other witness who testified, or to make objections concerning this witness or evidence proffered by Movant. Yet, the only pertinent objections, which Respondent's counsel made, concerned hearsay and privilege. Respondent has articulated his position on those mat-

---

dispute, Wolk says "I won't be taking it up with Judge Carnes, that's for sure."); at 159 (the same). Respondent also demonstrated difficulty conducting himself in a professional manner with regard to his interactions with opposing counsel. *See, e.g.,* Genter Dep. at 31–32, 55–57, 213, 233, 296–99; Wolk Dep. 66, 84, 108, 112, 164–65, 196, 248, 252, 273).

**57.** Ford: Your Honor, if I may just ask the Court's indulgence, I think we might, *with the Court's permission,* want to submit a supplemental affidavit from Mr. Genter specifically addressing the testimony, what Mr. Friedman here said today about the meaning of that litigation. That was a surprise to us. We didn't know that. And *I understand the Court's rulings earlier on today,* but we would simply *ask the Court's permission* to submit that to the record for the Court's consideration.

 Quinn: Well, you know, we would object to that, your Honor. They say they didn't hear it today, but this is the witness who those chose not to depose. They would have heard it a couple of weeks ago. So the record ought to be closed now, we think, and an affidavit would be hearsay and would not be admissible in any event. The Court: All right.
Ford: Your Honor, we would certainly produce Mr. Genter, to the extent we have control over him, to answer to that affidavit.
The Court: Well, *the record is closed.* You had an opportunity to fully question Mr. Genter. This was an issue that you all were pushing about zingers. I believe that was the phrase. And if you thought there were zingers, there should have been something more than conclusory testimony. You should have fleshed that out with Mr. Genter. You knew Mr. Friedman was the other party negotiating, you knew you could have deposed him and you knew he could testify. So I don't want to reopen this record. We have got to have finality at some point, so *I deny your request.*
(*Id.* at 348–49 (emphasis added).)

ters in his post-hearing submission.[58] Moreover, as the Court has concluded that the testimony of this witness, Mr. Friedman, was ultimately not germane to the pertinent issues, no harm resulted from Respondent's inability to advocate his own legal positions on these matters.

## B. Friedman's Testimony

In his motion to vacate and for recusal, Respondent had indicated that Movant had become aware, through negotiations concerning the release in the *Taylor* case, that Respondent would be suing. (Mem. in Supp. of Respondent's Mot. to Vacate Judge Carnes' Order of April 28, 2004 and For Recusal [223] at 8.) Misunderstanding that the release discussions post-dated by approximately two months the Movant's agreement not to oppose the vacating of the Omnibus Discovery Order, this Court pointed this out as a possible ground for Respondent to use to modify the Protective Order. (May 17, 2004 Order [239] at 10–11; Hrg. Tr. [265] at 71–72.) In this same vein, Respondent testified at the contempt hearing that Movant tried to insert "zingers" into the releases, which zingers would presumably, in a cryptic fashion, prevent Respondent from suing for defamation. (Hrg. Tr. [265] at 90–91, 213.)[59]

To rebut this testimony, Movant called Jonathan Friedman, the Lord Bissell and Brook associate who negotiated the language of the release with Mr. Genter. Re-

spondent has contended that it was unfair to allow Movant to present Friedman's testimony because Friedman was a surprise witness whom Respondent had not been allowed to depose. (Respondent's Br. in Supp. of Dismissal [268] at 2–3.) Again, the record belies Respondent's assertion. Respondent was well aware that Friedman had been involved in negotiating the release. Indeed, Respondent had noticed his deposition, but then cancelled it. (Opp'n of Teledyne Technologies Inc. to Mot. of Arthur Alan Wolk for Extension of Disc. Cutoff [231] at 11.) In fact, Respondent told this Court that he had decided that deposing Mr. Friedman was "not necessary for his defense." (May 13, 2004 Letter to Court, attach. to Notice Canceling Teleconference [236], at 2.)

At any rate, Respondent has failed to offer any evidence that supports his original assertion that Movant attempted, through the release negotiation, to add language that precluded Respondent from suing for defamation. Indeed, as Respondent was never intended as a signatory to the document, there would be no means to so bind him. Further, as the release negotiations post-dated by two months Movant's decision to acquiesce in Respondent's efforts to vacate the Omnibus Discovery Order, Friedman's testimony has had no impact on this Court's determination here.

---

**58.** Indeed, Respondent, though counsel, had repeatedly objected to certain testimony by Mr. Friedman on hearsay grounds. As to some of the objections, the Court had likened the testimony to a verbal act that was not subject to the hearsay rule. (*See* Hrg. Tr. [265] at 299–306.) In continuing to dispute the Court's ruling, Respondent wrote in his post-hearing submission: "[a] verbal act is like when one driver flips another the bird for cutting in front of him in traffic." (Br. in Supp. of Dismissal [268] at 4.) Thus, Respondent was able to present, in writing, the advocacy that the Court and other participants

were spared at the hearing. (Respondent's Br. in Supp. of Dismissal [268] at 4.)

**59.** According to Respondent, he and the other lawyers at his firm representing plaintiffs in the underlying litigation "would get a release. We'd give them the comments. We'd think we have a deal. Then we get a document back that we thought would incorporate the comments and they put another zinger in that would have affected the ability of me to bring a lawsuit against them later on." (Hrg. Tr. [265] at 90–91.)

## CONCLUSION

For the foregoing reasons, while the Court has previously granted Movant's Application for Order to Show Cause [175], it declines to hold Respondent in contempt, but the Court **GRANTS, in part**, and **DENIES, in part**, Movant's Alternative Request to Vacate the May 20, 2003 Protective Order [161].

The Court **DENIES as moot** the following motions: Motion for Limited Unsealing of Documents Relating to Arthur Alan Wolk [222]; Motion for Relief from Court's April 28, 2004 Order Pursuant to Federal Rule of Civil Procedure 60(b) [229]; Motion for Sanctions Pursuant to Federal Rule of Civil Procedure 11[232]; Emergency Motion to Compel Production of Documents [237]; AND Motion to Strike Teledyne's Witnesses and Evidence Listed in Its Pre–Hearing Memorandum [246–1] Which were Requested in Discovery but not Provided on Basis of Improper Privilege Assertions [260].